602 S.E.2d 506

**Kathy Kay ALLEY, Plaintiff Below, Appellee**

v.

**CHARLESTON AREA MEDICAL CENTER, INC., Defendant Below, Appellant**

**No. 31591.**

Supreme Court of Appeals of West Virginia.

Submitted April 27, 2004.

Decided June 24, 2004.

Susan Curry Brasselle, Arden J. Curry, Pauley, Curry, Sturgeon & Vanderford, Charleston, for the Appellee.

Constance H. Weber, Stephen A. Weber, L. Kevin Levine, Kay, Casto & Chaney, P.L.L.C., Charleston, for the Appellant.

PER CURIAM:

Charleston Area Medical Center (hereinafter referred to as "CAMC") appeals from the June 18, 2001, judgment order and subsequent October 4, 2002, order denying the request for judgment as a matter of law and a new trial entered by the Circuit Court of Kanawha County in this case. The nature of the suit underlying these orders, brought by Kathy Kay Alley (hereinafter referred to as "Appellee"), was an action alleging wrongful discharge due to CAMC's failure to make reasonable accommodation for physical and mental impairments in violation of the West Virginia Human Rights Act. The fifteen assigned errors CAMC outlines in this case allege in general that there was insufficient evidence to establish a duty to accommodate and that the evidence and relevant law do not support the instructions given to the jury or the jury's verdict regarding damages. Having completed our review of these errors in conjunction with the briefs and arguments of counsel, the record certified to this Court and legal authorities, we affirm the lower court decision.

## I. Factual and Procedural Background

Appellee was first employed at CAMC in December 1978 as a nursing assistant. Within the first year of her employment she moved to the position of respiratory technician within the hospital's Respiratory Care and Sleep Disorders Center. Appellee remained a respiratory technician for the remainder of her employment with CAMC, often rotating among the hospital's three divisions, until she was terminated on September 24, 1996. It is not disputed that Appellee's job performance during her over seventeen years of employment with CAMC was anything less than satisfactory and that Appellee had received various promotions and pay raises throughout her tenure. It is also undisputed that CAMC paid Appellee's expenses to further her education in the field of respiratory therapy, from which she received a certificate of graduation from the California College for Respiratory Therapy in April 1982.

From the record it appears that in 1994 Appellee began having physical reactions to the chemicals administered to patients and

cleaning substances used at the hospital.[1] While performing her duties on December 18, 1994, Appellee had an asthmatic episode and was taken to the emergency room, where she was stabilized and referred to the Asthma and Allergy Clinic. Thereafter, Appellee requested a twelve week family medical leave of absence which the hospital approved on December 28, 1994, with the agreement that the leave could be taken intermittently as needed. As Appellee continued to have asthma problems, she again sought medical leave for the chronic attacks of asthma in December 1995. In February 1996, CAMC again granted Appellee intermittent family medical leave. It was around this time that Appellee began seeing Dr. Mark L. Douglas with CAMC Physician Health Group for treatment of her asthma and epilepsy. When Appellee had another asthma attack on March 15, 1996, Dr. Douglas placed her on prednisone to open her airways. Unfortunately, prednisone caused Appellee to develop a serious skin infection, producing a highly offensive odor, requiring further treatment with antibiotics. Around the same time Doctor Douglas wrote an excuse slip dated April 4, 1996, stating: "Please excuse Kathy from work 4/4/96—4/12/96." That same day Dr. Douglas wrote a letter stating the following:

RE: Kathy Alley

To Whom It May Concern:

I feel that Kathy would be best suited to outpatient care at this point in time. Kathy has multiple medical problems which affect care including epilepsy, asthma, severe skin infections from time to time. I feel it may be in her best interest not to be around patients who have multiple infections and have other health problems that could affect her health.

If you have any questions, please feel free to call me.

Sincerely,

Mark D. Douglas, D.O.

Appellee testified that when she returned to work on April 14 or 15, 1996, she took the above letter to Employee Health Services at CAMC and the nurse there said that Appellee needed to discuss the matter with the Director of Personnel, Steve Buris, who at the time was on vacation. Appellee alternatively met with a Human Resources assistant who said she could not help Appellee identify suitable alternative jobs at CAMC. Appellee explained during her testimony that she then took the letter to her supervisor of approximately fifteen years, Karen Stewart, who held the title of Director of Respiratory Care and Sleep Disorders. Ms. Stewart directed Appellee to take the letter to Employee Health. Rather than immediately following Ms. Stewart's advice, Appellee decided to wait to discuss the matter with Mr. Buris when he returned from vacation. According to Appellee, when she met with Mr. Buris he said that he could not help her out and that she needed to meet with Dr. Manmohan V. Ranadive, who was the occupational medicine physician with CAMC's Employee Health Services. Dr. Ranadive testified in an evidentiary deposition that he read the letter, talked to Dr. Douglas, and then told Ms. Alley that CAMC could not accommodate her. He felt that she was depressed and recommended that she see a psychiatrist. Appellee followed Dr. Ranadive's advice and began seeing a psychiatrist, Dr. Settle, sometime later in May 1996. The psychiatrist diagnosed Appellee with severe depression and recommended that Appellee take family medical leave. Appellee next spoke to her supervisor, Karen Stewart, about taking medical leave and Ms. Stewart told Appellee to take as much time as she needed. After filing the proper paper work, completed in part by CAMC's Human Resources Director, Appellee went on continuous rather than intermittent medical leave on May 30, 1996.

During this time, Karen Stewart, who was instrumental in getting the Legislature to enact a respiratory therapy licensing law during the 1995 legislative session,[2] held a meeting, at which attendance of all respiratory technicians was required. The purpose of the meeting was to explain the provisions of

---

1. Appellee testified that she had asthma since childhood and that CAMC knew of this fact since at least 1982; CAMC did not contest the fact that Appellee has asthma.

2. 1995 W.Va. Acts ch. 196.

the new law, which were due to go into effect July 1, 1996. A copy of CAMC's newly adopted policy regarding licensure, developed after the new law passed, was also distributed at the meeting. The new law, entitled the West Virginia Board of Respiratory Care Practitioners Act (hereinafter referred to as "Act"),[3] required all persons who practice as respiratory care technicians or respiratory therapists to be licensed. One of the criteria fixed by the Act for obtaining a license was passing an examination. W.Va. Code § 30–34–8(a)(2). The Act also provided that those individuals employed as respiratory care providers at the time the bill took affect could obtain a temporary permit to remain employed for up to six months under the conditions that they were taking the requisite steps to become licensed and had not failed the examination. W.Va.Code § 30–34–9. The process for obtaining a temporary permit was explained during the meeting and the permit application was distributed. An additional provision of the Act, although not discussed by Ms. Stewart at the April meeting, would allow individuals who had worked for two years as respiratory care providers to obtain a temporary license to practice respiratory care. The temporary license would remain in effect until the individuals qualified for a permanent license, which in all instances had to be accomplished no later than April 12, 1997.[4] W.Va.Code § 30–34–11, 1995 W.Va. Acts ch. 196.

While Appellee was on family medical leave, she sat for the licensure examination but failed it by two questions. Subsequently, while still on leave from work, Appellee received a letter from Karen Stewart dated August 8, 1996, informing Appellee that: (1) her position in the pulmonary function department had been posted because she had been absent from work for thirty days, and (2) her family medical leave had been exhausted. The letter further indicated that "[w]hen you are released to return to work the personnel department can assist you if there is a position for which you are qualified."

Karen Stewart wrote Appellee another letter on September 9, 1996, in which Ms. Stewart informed Appellee that because she had failed the licensure examination her temporary permit had been revoked by the state and, as a result, Appellee was no longer qualified to remain employed at CAMC as a respiratory technician because all of the respiratory care positions at CAMC required a license. In the same letter Ms. Stewart informed Appellee that CAMC would provide her with a two week period in which to find another position at CAMC for which she was qualified. The two week period ended on September 24, 1996. As Appellee's physician, Dr. Settle, had not released her to return to work, Appellee's employment with CAMC was terminated as of that date.

Appellee filed suit against CAMC in the circuit court on May 14, 1998. In her amended complaint, Appellee alleged that she had been subjected to retaliatory discharge based on physical and mental impairment, CAMC's refusal to make reasonable accommodations for Appellee's known impairments was a violation of the West Virginia Human Rights Act and CAMC, with knowledge of Appellee's asthma, exposed her to substances that exacerbated her condition. The relief requested in the complaint was $500,000 for medical and related expenses, $500,000 for lost earnings and loss of future earnings and earning potential, and $500,000 for pain, suffering and emotional distress.

Trial in the case began on May 29, 2001, and concluded on June 4, 2001, with the jury returning a verdict in favor of Appellee with an award of $175,000 for lost wages and $150,000 for pain, suffering and emotional distress, or a total award of $325,000. On June 11, 2001, CAMC filed a renewed motion for judgment as a matter of law or, in the alternative, a motion for a new trial. The motion was taken up at a hearing before Judge Canady on July 13, 2001, but no ruling was entered prior to the retirement of Judge Canady on April 30, 2002. The case was reassigned to Judge Jennifer Bailey Walker, who, by order entered October 4, 2002, de-

---

3. Codified at W.Va.Code §§ 30–34–1 to –17.

4. By subsequent legislative amendment in 1997, this cutoff date was changed to December 31, 1997. W.Va.Code § 30–34–11 (1997).

nied the motions. Petition for appeal was filed in this Court on April 23, 2003, with the requested review granted by order dated October 28, 2003.

## II. Standard of Review

Five of the errors assigned by CAMC in this appeal deal with the lower court's refusal to grant CAMC's motion for a judgment as a matter or law and the remaining alleged errors involve the lower court's denial of the new trial motion.

■■■ As succinctly summarized in *Fraternal Order of Police, Lodge No. 69 v. City of Fairmont*, 196 W.Va. 97, 100 n. 2, 468 S.E.2d 712, 715 n. 2 (1996):

The circuit court's denial of the motion for judgment as a matter of law poses a question of law, and, therefore, this Court's review of such a ruling is plenary. In addressing such issues on appeal, we must approach the evidence from a coign of vantage identical to that employed by the trial court in the first instance. This approach dictates that we take the record in the light most flattering to the nonmoving party, without probing the veracity of the witnesses, resolving conflicts in the testimony, or assaying the weight of the evidence. We may reverse the denial of such a motion only if reasonable persons could not have reached the conclusion that the jury embraced.

*See also* Syl. Pt. 1, *Mildred L.M. v. John O.F.*, 192 W.Va. 345, 452 S.E.2d 436 (1994); Syl. Pt. 3, *Alkire v. First Nat'l Bank*, 197 W.Va. 122, 475 S.E.2d 122 (1996).

The standard we apply when reviewing a lower court's denial of a new trial motion is stated in *Tennant v. Marion Health Care Foundation, Inc.*, 194 W.Va. 97, 459 S.E.2d 374 (1995):

We review the rulings of the circuit court concerning a new trial and its conclusion as to the existence of reversible error under an abuse of discretion standard, and we review the circuit court's underlying factual findings under a clearly erroneous stan-

dard. Questions of law are subject to a *de novo* review.

*Id.* at 104, 459 S.E.2d at 381.

We proceed to apply these standards to the particular circumstances before us.

## III. Discussion

### A. Failure to Grant Judgment as a Matter of Law

■■■ In support of CAMC's argument that the lower court committed error by not awarding it judgment as a matter of law, CAMC maintains that Appellee failed to produce sufficient evidence for a reasonable jury to find in her favor on every essential element of her claim of failure to accommodate under the West Virginia Human Rights Act. A person bringing a claim for breach of the duty to make reasonable accommodation under the West Virginia Human Rights Act must prove the following essential elements, laid down in syllabus point two, in part, of *Skaggs v. Elk Run Coal Co., Inc.*, 198 W.Va. 51, 479 S.E.2d 561(1996),

(1) The plaintiff is a qualified person with a disability; (2) the employer was aware of the plaintiff's disability; (3) the plaintiff required an accommodation in order to perform the essential functions of a job; (4) a reasonable accommodation existed that met the plaintiff's needs; (5) the employer knew or should have known, of the plaintiff's need and of the accommodation; and (6) the employer failed to provide the accommodation.

In light of these recognized elements, CAMC claims that the evidence presented by Appellee failed to establish that she was disabled because it did not demonstrate that her impairment substantially limited one or more major life activity. CAMC posits that should we find there was sufficient evidence upon which a jury could find Appellee had a qualified disability, it was not proven that Appellee was able and competent to perform the job of respiratory therapy technician because she did not obtain the requisite license. Additionally, CAMC maintains that Appellee did not prove that she needed an accommodation to perform the essential functions of the job, and even if this was proven Appellee did not demonstrate that a reasonable accommoda-

tion existed that would meet her needs. Correlatively, CAMC claims that it did not know nor should it have known about Appellee's needs or any accommodation that could have been made.

■ With regard to the first element set forth in *Skaggs*, the definition of "disability" in the West Virginia Human Rights Act explains that the term "major life activities" includes "functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." W.Va.Code § 5–11–3(m)(1) (1998) (Repl. Vol. 2002). It is undisputed that Appellee suffers from asthma, which the letter of Dr. Douglas admitted into evidence specifically stated and to which Appellee testified. Furthermore, the affect the asthma had not only on her breathing but also on her working was amply demonstrated through Appellee's testimony[5] and evidence regarding Appellee's need to intermittently use family medical leave to tend to her chronic asthma condition.

■ CAMC relatedly claims that Appellee could not prove nor could a jury find that Appellee was a qualified individual with a disability because there was no evidence that Appellee was competent and able to perform the work of a respiratory therapy technician, with or without accommodation, because she was not licensed. While this argument may be true after the licensing requirement took effect on July 1, 1996, the evidence reflects that Appellee informed CAMC of her problems and CAMC refused to provide accommodations prior to the date of the statute. The licensure requirement, occurring after the request for and denial of accommodation, is really a red herring in the discussion regarding the existence of disability and the duty to accommodate. As CAMC admits, aside from meeting the licensure requirement, Appellee's level of practical skill and experience was well documented. This level of documentation was sufficient for a jury to find that Appellee was able and competent to perform the job in question at the time the accommodation request was made.

■ The next accommodation element which CAMC claims was not supported by sufficient evidence is proof that Appellee required an accommodation in order to perform the essential functions of the job. The hospi-

5. Portions of Appellee's testimony relating how asthma affected her ability to breathe and to work follow:

> Q: When you were administering this Pentanamine test, how did it affect you?
> A: Well, the Pentanamine itself... [was given] in a very small room. It had a very metallic taste to it. And I would notice after giving the treatment, I would cough quite a bit afterwards, and I would have to use my inhaler.
> * * *
> Q: Did you ever have asthma attacks and such?
> * * *
> A: There were numerous times that I had asthma attacks at work....
> * * *
> I know one time at Women's and Children's Hospital, they were doing what they called a respirator fit. That was an OSHA requirement. And I wasn't able to—employee health doctor, which was Dr. Tehern (phonetic), she would not let me even be fit for a respirator because I was on a lot of breathing medication.
> * * *
> But I was in the same—in my office. It was a little area, smaller area, and they were fitting some other people in a different room, but it sort of connected. And they were using some kind of sulphur or something, and I had a real severe asthma attack that day.

Relating another incident, Appellee explained:
> Okay. There was some blood that had dripped on the floor. I was holding pressure on the patient's arm to keep the patient from bleeding.
> One of our co-workers came in and she had a gallon of Clorox. I had been having trouble with my asthma, and I asked her kindly, I pleaded to her; I said, Teddy, please do not pour that Clorox in the floor.
> She ... took pure Clorox and poured it in the floor with both me and the patient in the room ....
> * * *
> I was taken to employee health and sent straight to the emergency room, excuse me, put on IV medications for severe asthma attack. I missed several days of work, had to go to the asthma and allergy center.

With regard to the portion of her job involving pulmonary function testing Appellee said:
> I did a test procedure called methacholine challenge testing....
> ... When I went to Memorial Division, and that test procedure was something that you gave to patients to induce asthma attacks. And I had a lot of complications.
> I've had to use my inhaler very frequently when I gave that test procedure. You would actually induce asthma attacks on patients when you did that test procedure.

tal's argument is based on its interpretation of syllabus point one of *Skaggs*, which states:

> Under the West Virginia Human Rights Act, W. Va.Code, 5–11–9 (1992), reasonable accommodation means reasonable modifications ·or adjustments to be determined on a case-by-case basis which are designed as attempts to enable an individual with a disability to be hired or to remain in the position for which he or she was hired. The Human Rights Act does not necessarily require an employer to offer the precise accommodation an employee requests, at least so long as the employer offers some other accommodation that permits the employee to fully perform the job's essential functions.

*Skaggs*, 198 W.Va. at 58, 479 S.E.2d at 568. CAMC incorrectly reads this holding to mean that "an employer's duty to accommodate arises only when an employee is no longer able to perform his or her job." The proof that is needed to satisfy this element as stated in syllabus point two of *Skaggs* is a showing that "the plaintiff required an accommodation in order to perform the *essential functions* of a job." *Id.* at Syl. Pt. 2, 479 S.E.2d 561 (emphasis added). Obviously, a person can not fully perform the essential functions of a job when he or she is absent for whatever reason. For purposes of accommodation, the reason for the absence must be due to a qualified disability. The record shows that the Appellee offered evidence to illustrate her inability to fully perform the essential functions of her job due to her disabling condition by means of her testimony. In this testimony she explained that she experienced asthmatic reactions when she was exposed to certain chemicals during the tests she administered, and such reactions caused her to seek medical attention and on some occasions use sick leave in order to recover.[6]

■ The next challenged element involves proof that "a reasonable accommodation existed that met the plaintiff's needs." *Id.* CAMC's contention is that Appellee failed to identify any specific available position for which Appellee qualified. Appellee correctly points out that there is no requirement that a specific available alternative position exists when requesting an accommodation. Immediately following our recitation of the six elements necessary to state a claim for breach of duty to accommodate, we went on to explain in footnote 11 of *Skaggs* that:

> These factors apply to most accommodation cases. There may, however, be some variation. For example, a plaintiff also could state a claim by alleging an employer refused to consider or discuss accommodation—even though it then was unaware of any particular accommodation and even though the plaintiff did not identify the accommodation—so long as some accommodation was possible at the time the adverse action was taken against the plaintiff. As with all our employment discrimination doctrines, flexibility and common sense must guide decisionmaking.

198 W.Va. at 65–66 n. 11, 479 S.E.2d at 575–76 n. 11. Consequently, Appellee's burden was not to prove that a specific alternative position was available, but whether some accommodation was possible. The record shows that Appellee had applied for a posted scheduling position at the hospital around the time that Dr. Douglas' written suggestion that Appellee be relocated due to her disabilities was written. The testimony of a clerk in personnel established that this position was not filled until July, after the management at CAMC had been informed of Appellee's request for accommodation. From this evidence, a jury could conclude that an accommodation was possible.

■ CAMC finally maintains that the evidence did not establish that it knew or should have known of Appellee's need for accommodation or of the accommodation itself. CAMC argues that at all relevant times, the information that it possessed regarding Appellee's medical condition indicated no medical reason that Appellee could not continue to work as a respiratory therapy technician. In

---

**6.** We note that the situation presented in this case is distinguishable from our recent decision in *Williams v. Charleston Area Medical Center, Inc.*, 215 W.Va. 15, 592 S.E.2d 794 (2003), in that no argument was made here that the accommodation sought involved the elimination of an essential function of the job.

this regard, CAMC relies upon the notes and testimony of its occupational medicine physician at the time, Dr. Ranadive, who concluded that the letter from Dr. Douglas and his subsequent conversation with Dr. Douglas did not support Appellee's claim that she was medically unable to continue her duties as a respiratory therapy technician without accommodation. Whether or not CAMC agreed with the recommendations of Appellee's doctor is not the point which needs to be proven. The record shows that Appellee presented a variety of instances by which CAMC was put on notice of Appellee's need for accommodation. In addition to the written statement of Dr. Douglas, other examples of evidence which could establish that CAMC knew or should of known about Appellee's need for accommodation were presented through Appellee's testimony. The testimony related numerous occasions when Appellee was working when she had an asthmatic attack from the chemicals she was administering and for which she had to go to the employer's emergency room or otherwise seek medical attention. The testimony also recounted that a doctor at the hospital recognized that Appellee could not be equipped with a respirator pursuant to OSHA requirements because of the medicines she was taking for her breathing problems. Furthermore, Appellee's supervisor, Ms. Stewart, knew of the problems Appellee was having and knew that Appellee was using family medical leave as a result. The record is far from bereft of evidence from which a jury could conclude that CAMC knew or should have known of Appellee's need for accommodation.

Having found adequate evidence supporting each of the contested elements upon which reasonable persons could have reached the conclusion that the jury embraced, we conclude that the trial court was correct to deny CAMC's post-trial motion for a judgment as a matter of law.

## B. Failure to Grant a New Trial

It is maintained by CAMC that the lower court erred in not granting a new trial on two bases: by incorrectly instructing the jury and by allowing an excessive damage award to stand.

## 1. Jury Instructions

■■■■ CAMC asserts the trial court committed error in giving or refusing to give certain jury instructions. The parameters of a trial court's discretion in instructing the jury is outlined in syllabus point four of *State v. Guthrie*, 194 W.Va. 657, 461 S.E.2d 163 (1995), as follows:

A trial court's instructions to the jury must be a correct statement of the law and supported by the evidence. Jury instructions are reviewed by determining whether the charge, reviewed as a whole, sufficiently instructed the jury so they understood the issues involved and were not mislead by the law. A jury instruction cannot be dissected on appeal; instead, the entire instruction is looked at when determining its accuracy. A trial court, therefore, has broad discretion in formulating its charge to the jury, so long as the charge accurately reflects the law. Deference is given to a trial court's discretion concerning the specific wording of the instruction, and the precise extent and character of any specific instruction will be reviewed only for an abuse of discretion.

Moreover, this Court has also held that "[a]n instruction is proper if it is a correct statement of the law and if there is sufficient evidence offered at trial to support it." Syl. Pt. 5, *Jenrett v. Smith*, 173 W.Va. 325, 315 S.E.2d 583 (1983).

■■■■ With regard to the refusal to give an instruction, we held in syllabus point eleven, *State v. Derr*, 192 W.Va. 165, 451 S.E.2d 731 (1994), that:

A trial court's refusal to give a requested instruction is reversible error only if: (1) the instruction is a correct statement of the law; (2) it is not substantially covered in the charge actually given to the jury; and (3) it concerns an important point in the trial so that the failure to give it seriously impairs a defendant's ability to effectively present a given defense.

It is CAMC's position that the trial court erred both by giving some instructions and

by refusing others. Some of these claims of error are meritless based on our discussion in Part A of this opinion regarding the elements necessary to prove an employer's duty to accommodate.[7] The remaining errors charged by CAMC involve the lower court giving an instruction about emotional distress and refusing three of the instructions CAMC proposed.

■ CAMC contends that there was no evidence presented at trial to show that Appellee suffered from emotional distress, making it error for the lower court to instruct the jury as follows: "The term 'emotional distress' as used in these instructions is often described in common usdage [sic] by various other terms, such as mental distress, mental suffering, or mental anguish." As Appellee concedes, the record does not contain an overwhelming amount of evidence regarding emotional distress; however, it is not devoid of such evidence. The record shows that Appellee went through the proper channels in asking for an accommodation, including meeting with Dr. Ranadive as the employee health physician. The transcript of Appellee's testimony about what occurred when Dr. Ranadive told her that CAMC would not provide accommodation reads as follows:

Q: So, tell us what—how did that affect you? What did you do at that time?

A. Well, I cried, I mean it bothered me. It upset me. I did cry. I mean, after 18 years of employment, and I took all the proper steps that I thought that I was supposed to have taken. And I was having difficulty performing my job.

And they're telling me with all the jobs available at CAMC—I've worked for them for 18 years but that I can't get another job somewhere in that institution. . . .

Dr. Ranadive testified that he thought that Appellee was depressed, as evidenced by her crying, and referred her to a psychiatrist. Appellee then went to a psychiatrist, Dr. Settle, who diagnosed her as suffering from depression. She continued to see Dr. Settle until he retired and then she continued her treatment with Dr. Settle's partner through the time of trial.

■ This Court has long held that "if there be evidence tending in some appreciable degree to support the theory of proposed instructions, it is not error to give such instructions to the jury, though the evidence be slight, or even insufficient to support a verdict based entirely on such theory." Syl. Pt. 2, *Snedeker v. Rulong*, 69 W.Va. 223, 71 S.E. 180 (1911). As the record contains some evidence to support the existence of emotional distress, we find no error with the instruction.

■ The remaining instructional errors charged involve the lower court's refusal to give instructions CAMC requested. First among these, CAMC maintains that the lower court should have instructed the jury that: "The employer has no duty to divine the need for a special accommodation where the employee merely makes a mundane request for a change at the workplace." *Reed v. LePage Bakeries, Inc.*, 244 F.3d 254, 261 (1st Cir.2001). Appellee reminds us of our relevant observation in *Adkins v. Whitten*, 171 W.Va. 106, 297 S.E.2d 881 (1982), that "under our jury trial system, it is incumbent on the court by way of instruction or charge to inform the jury as to the law that is applicable to the facts of the case." *Id.* at 109, 297 S.E.2d at 884. The facts in this case do not support the language proposed by CAMC.

7. CAMC argued that the trial court erred by instructing the jury that a medical leave of absence was an appropriate form of accommodation because the plaintiff offered no evidence that she requested additional medical leave. As we previously explained, an employee is not required to prove that a specific alternative was available or requested, but rather whether some accommodation was possible.

Refusal of the trial court to instruct the jury with regard to the licensure requirement affecting respiratory therapists was the subject of two errors assigned by CAMC. As we earlier noted,

the licensure requirement post-dated Appellee's request for accommodation. Regardless of whether the proffered instruction was a correct statement of the law, it was not consistent with the evidence in the case and was properly refused.

The last instructional issue related to the accommodation elements involves CAMC's contention that the jury should have received instruction that Appellee had to show there was a vacant position for which she was qualified. As this is not a correct statement of law, the lower court correctly refused to give the instruction

The request for accommodation here was not made in passing and took the form of a written letter, signed by a physician, explaining that Appellee suffered from asthma, epilepsy and severe skin infections, for which it was in the best interest of his patient to be removed from the proximity of patients with multiple infections or other problems which could affect Appellee's health. The doctor's letter also suggested that Appellee was best suited to outpatient care. This documentation does not reflect a "mundane request for a change at the workplace." 244 F.3d at 261. As we do not find the evidence supports the theory behind the requested instruction, we see no error.

■ As its next error assigned to the lower court, CAMC claims the jury should have been instructed as to the precise meaning of the term "disability" under the Social Security Act, apparently to make a distinction as to the different meaning attached to the term under the West Virginia Human Rights Act. CAMC argues that without this instruction, the jury was misled into believing that Appellee had to be disabled under the state Human Rights Act because she was receiving Social Security disability benefits. It appears, however, that CAMC was actually requesting a second instruction on this topic, because the lower court did tender the following Instruction 22 to the jury:

> The Court instructs the jury to take notice that the Social Security Administration examines a particular set of criteria when determining if a person is disabled for the purpose of granting Social Security Disability Insurance ("SSDI") benefits and the West Virginia Human Rights Act ("WVHRA") applies a completely different analysis. Thus, although the plaintiff was granted, and is still receiving, SSDI benefits, receipt of such benefits is not necessarily determinative of whether the defendant is considered to be a "qualified person with a disability" under the provisions of the WVHRA.

We do not find that the lower court abused its discretion in not providing an additional instruction on this issue.

■ The last issue raised by CAMC regarding the jury instructions given involves the lower court's refusal to give an instruction about the facial contradiction created when a plaintiff swears that he or she is totally disabled and unable to work at any job for the purpose of obtaining Social Security disability benefits, often referred to as SSDI, and subsequently claiming that he or she could perform the essential functions of his or job for the purpose of asserting a claim under the Human Rights Act. CAMC argues that it was deprived of an essential element of its defense when the instruction was not given about this duty of Appellee as established by the United States Supreme Court in *Cleveland v. Policy Management Systems Corporation*, 526 U.S. 795, 119 S.Ct. 1597, 143 L.Ed.2d 966 (1999). In *Cleveland*, a case involving an Americans with Disabilities Act claim (hereinafter referred to as "ADA"), the United States Supreme Court stated that:

> "[The] pursuit, and receipt, of SSDI benefits does not automatically estop the recipient from pursing an ADA claim. Nor does the law erect a strong presumption against the recipient's success under the ADA. Nonetheless, an ADA plaintiff cannot simply ignore her SSDI contention that she was too disabled to work. To survive a defendant's motion for summary judgment, she must explain why that SSDI contention is consistent with her ADA claim that she could "perform the essential functions" of her previous job, at least with "reasonable accommodation."

*Id.* at 797–98, 119 S.Ct. 1597.

The record shows that CAMC was permitted to argue this point to the jury. Additionally, the testimony of both Appellee and a vocational specialist explained that to be disabled under the SSDI requirements a person must prove an inability to work without consideration of whether or not an accommodation would allow a person to continue working. As a result, we do not find that the court below abused its discretion in refusing the instruction.

Reviewing the charge as a whole, we find that the jury was sufficiently instructed on the relevant matters involved in this case and was not incorrectly informed about the issues

or applicable law. Accordingly, we find no abuse of discretion.

## 2. Damages

CAMC next claims that a new trial should have been granted in this case because the damages awarded bear no rational relationship to the evidence, are excessive and contrary to law.

 As set forth in syllabus point one of *Addair v. Majestic Petroleum Co., Inc.,* 160 W.Va. 105, 232 S.E.2d 821 (1977), "Courts must not set aside jury verdicts as excessive unless they are monstrous, enormous, at first blush beyond all measure, unreasonable, outrageous, and manifestly show jury passion, partiality, prejudice or corruption." In reviewing whether there is sufficient evidence to support a jury verdict, we:

> (1) consider the evidence most favorable to the prevailing party; (2) assume that all conflicts in the evidence were resolved by the jury in favor of the prevailing party; (3) assume as proved all facts which the prevailing party's evidence tends to prove; and (4) give to the prevailing party the benefit of all favorable inferences which reasonably may be drawn from the facts proved.

Syl. Pt. 5, in part, *Orr v. Crowder,* 173 W.Va. 335, 315 S.E.2d 593 (1983). As the verdict is entitled to considerable deference, "an appellate court should decline to disturb a trial court's award of damages on appeal as long as that award is supported by some competent, credible evidence going to all essential elements of the award." Syl. Pt. 4, in part, *Reed v. Wimmer,* 195 W.Va. 199, 465 S.E.2d 199 (1995).

 Turning to the evidence presented in this case and viewing it in the light most favorable to Appellee as required, we find that the damages awarded were not unreasonable. Appellee had worked for CAMC for over seventeen years and suffered from epilepsy and asthma, with the asthma becoming increasingly aggravated by on-the-job exposure to certain chemicals. While she continued to perform her job, to do so she had to use her inhaler more frequently, take additional medication which produced the side effects of severe skin infections, seek emergency room treatment on occasion and miss work intermittently to treat these conditions. Appellee's doctor wrote a letter explaining her physical conditions and, as an accommodation for her physical problems, requested that Appellee be allowed to work in an outpatient setting and not be exposed to people with multiple infections. Although Appellee presented this request for accommodation to various supervisory personnel and to employee health services at the hospital, she was told that no accommodation would be made. The employee health services doctor, Dr. Ranadive, met with Appellee for five minutes and did not perform any tests or otherwise ask Appellee about the problems she was experiencing. Dr. Ranadive did call the doctor who had made the written request and summarily concluded that there was no medical reason why Appellee could not continue her employment and that CAMC would not accommodate her. This refusal to accommodate during her meeting with Dr. Ranadive resulted in Appellee exhibiting her distress by crying. Apparently, Appellee's distress was significant, in that Dr. Ranadive suggested that she obtain the services of a psychiatrist and the psychiatrist diagnosed depression serious enough to warrant directing Appellee to remain off the job on medical leave. Even after the hospital refused to accommodate Appellee, her desire to continue working remained strong and while on medical leave she sat for the respiratory therapy licensure examination. As her psychiatrist had not released her to return to work, Appellee remained on medical leave until it was exhausted and then was placed on short-term disability. It was during this time that she received notification from CAMC that she failed the licensure examination which caused revocation of her temporary permit. The notification letter, sent by the hospital with knowledge that Appellee was still on leave, also informed Appellee that she had two weeks to contact CAMC about possible transfer to another position or be terminated. Appellee was terminated and a month afterward, in an effort to pay her bills and to continue to purchase her medications, she applied for disability benefits from Social Security. Appellee continued to be treated

by the psychiatrist for depression after her date of termination. The record further shows that an economist presented information to the jury about the value of Appellee's lost wages based on an annualized loss in salary and benefits at $40,735.00. The economist estimated that Appellee's lost wages at age fifty would amount to over $553,000, and that at retirement at age sixty-seven the total would be over $1.2 million.

Based upon this evidence and reasonable inferences therefrom, a jury could determine that Appellee was a qualified person with a disability and that CAMC was aware of her disability. A jury could also conclude that Appellee required an accommodation in order to continue to perform the essential functions of her job and that a reasonable accommodation could be made under the circumstances. The evidence also established that CAMC should have known, if it did not indeed know, that Appellee requested and needed an accommodation to continue her employment. Appellee's depression, warranting treatment by a psychiatrist and directly linked to Appellee being told by the hospital's doctor that no accommodation would be made, was sufficient evidence to support the jury award of $150,000 for emotional distress. Furthermore, the $175,000 the jury awarded for lost wages was well within the range the economist presented as potential wage losses. Consequently, we have no basis upon which to set aside the jury award as it bears a rational relationship to the evidence and is not excessive nor contrary to law.

CAMC further argues that Appellee had a legal duty to mitigate damages and she failed to do so. *See* Syl. Pt. 2, *Mason County Board of Education v. State Superintendent of Schools,* 170 W.Va. 632, 295 S.E.2d 719 (1982). CAMC advances the same argument that it did below that Appellee failed to apply for a position with other hospitals in the area for a position for which she was trained and qualified.

There was no evidence that such a position was actually available or that Appellee was ever released from her doctor's care in order to apply for any position that may have existed. We further note that the lower court instructed the jury regarding Appellee's duty to mitigate damages and the jury apparently determined that the evidence did not support CAMC's implication during closing argument that Appellee was waiting "for the golden goose to come." While no one knows exactly what the jury discussed or how it arrived at the amount for the award of lost wages, the jury awarded a fair amount considering all of the circumstances, all of the evidence and the instructions it received. As such the trial court did not abuse its discretion in refusing to grant a new trial.

## IV. Conclusion

Accordingly, finding no merit in the arguments which would support judgment as a matter of law and for a new trial, we affirm the June 18, 2001 judgment order of the Circuit Court of Kanawha County.

Affirmed.