**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 23-2253**

LEANNA JEAN COFFMAN,

Plaintiff - Appellant,

v.

NEXSTAR MEDIA INC., a Delaware corporation,

Defendant - Appellee.

Appeal from the United States District Court for the Southern District of West Virginia, at Beckley, Frank W. Volk, Chief District Judge.  (5:22-cv-00396)

Argued: December 11, 2024                     Decided:  July 22, 2025

Before WYNN and THACKER, Circuit Judges, and FLOYD Senior Circuit Judge

Affirmed by unpublished per curiam opinion.

**ARGUED:**  Mark Alan Atkinson, ATKINSON & FRAMPTON, PLLC, Charleston, West Virginia, for Appellant.  Andrew F. Maunz, JACKSON LEWIS P.C., Pittsburgh, Pennsylvania, for Appellee.  **ON BRIEF:**  Marla N. Presley, JACKSON LEWIS P.C., Pittsburgh, Pennsylvania, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Leanna Jean Coffman appeals the district court's grant of summary judgment to her employer Nexstar Media, Inc. on three claims under the West Virginia Human Rights Act (WVHRA) and one claim under the Family Medical Leave Act (FMLA).  Having reviewed the record and considered oral argument, we affirm.

I.

A.

From February 17, 2020 to August 19, 2022, Coffman worked as an Account Executive at Nexstar's news station in Beckley, West Viriginia.  In 2021, she became pregnant with twins.  Near the end of her pregnancy, Coffman was diagnosed with placenta previa (i.e., a condition that causes severe bleeding) and placed on bedrest.  Nexstar approved Coffman's request to work remotely.

After about eight weeks of remote work (including a multi-week hospital stay), Coffman delivered twins via c-section on February 23, 2022.  She  immediately  received 12 weeks of FMLA leave.  *See* 29 U.S.C. § 2612(a)(1)(D) ("an eligible employee shall be entitled to a total of 12 workweeks of leave … [b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee").

A few days into leave, Coffman learned that her ureter (i.e., a tube that transports urine from the kidneys to the bladder) had been damaged during her c-section.  After an initial surgery to repair her ureter, Coffman was given a nephrostomy bag to drain her urine.  The bag caused severe pain and restricted her ability to stand, walk, and drive.

2

In early April, Dennie Large, Nexstar's Local Sales Manager, asked Coffman about her recovery. Coffman explained that she was "in and out of the hospital" with "constant Kidney infections and pain." J.A. 168. She recognized that she was about halfway through her FMLA leave but added: "the issue is I have to have another surgery." J.A. 169.

Coffman claims that she spoke with Large again in "mid to late April to May" to request a remote work accommodation. J.A. 146. Large denies that this conversation took place, but, according to Coffman, he promised to "run it up the flag pole" and then never got back to her. *Id.*

### B.

During several months of her recovery, Coffman received short-term disability benefits. The benefits were originally set to run from March 10 (i.e., when Coffman's paid leave expired) to June 27 (i.e., when doctors predicted that she could return to work). But, by June 28, Nexstar had yet to receive a doctor's return-to-work approval. Nexstar's Human Resources Assistant Cyndi Patrick called Coffman to check-in.

During the call, Coffman confirmed that she was unable to return to work: "they're extending [my short-term disability], I still have the [nephrostomy] tube." J.A. 174. When Patrick clarified that disability benefits did not extend FMLA leave (i.e., job-protected leave), Coffman asked if Patrick wanted to speak to her lawyer. Patrick declined and said that she would update Nexstar. After the call, Coffman texted Patrick: "Please do not contact me regarding a return to work date when I have been classified as unable to return and still have shortterm disability plus bonding leave." *Id.* In this same message, Coffman

3

provided her lawyer's contact information.

On July 28, Nexstar sent Coffman a letter to again request her return-to-work date. The letter began by outlining the history of Coffman's leave: "You have been on leave from work since February 23, 2022. You were provided with 12 weeks of leave under our FMLA policy which expired on May 17, 2022…. You applied for and received benefits under our Short-Term Disability policy. This policy provides a money benefit, but it is separate from job-protected leave." J.A. 208. The letter also highlighted Nexstar's earlier attempt to reach out and noted: "A directive not to contact you is not acceptable." *Id.*

Coffman responded on August 4. She explained that she was "still under intense care" and had another surgery scheduled for August 8. J.A. 184. She added that her recovery time would be about four-to-six weeks followed by a potential surgery in October.

On August 15, Nexstar terminated Coffman by email, effective August 19. The email stated: "Since you have been off work since February 23, 2022 and given the critical nature of the Account Executive position, we can no longer hold your job." J.A. 186.

C.

About a month after her termination, Coffman filed the instant action in the Southern District of West Virginia. She alleges three counts under the WVHRA: (1) failure to accommodate; (2) discriminatory discharge; and (3) retaliatory discharge. And she alleges one count under the FMLA: retaliatory discharge.

Nexstar moved for summary judgment on all claims, and the district court granted the motion in full. The court largely reasoned: (1) Nexstar provided Coffman six months

4

of leave, and her latest communications still "indicate[d] an inability and unwillingness to work" (J.A. 254); and (2) Coffman failed to demonstrate the existence of a reasonable accommodation that met her needs. Coffman now appeals.

## II.

We review the district court's grant of summary judgment *de novo*, "applying the same legal standards as the district court." *Shipton v. Balt. Gas & Elec. Co.*, 109 F.4th 701, 705 (4th Cir. 2024) (quoting *Heyer v. U.S. Bureau of Prisons*, 849 F.3d 202, 208 (4th Cir. 2017)). Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## A.

We begin by examining Coffman's WVHRA accommodation claim. To succeed on such a claim, a plaintiff must first make a prima facie case that:

> (1) [t]he plaintiff is a qualified person with a disability; (2) the employer was aware of the plaintiff's disability; (3) the plaintiff required an accommodation in order to perform the essential functions of a job; (4) a reasonable accommodation existed that met the plaintiff's needs; (5) the employer knew or should have known of the plaintiff's need and of the accommodation; and (6) the employer failed to provide the accommodation.

*Burns v. W. Va. Dep't of Educ. & Arts*, 836 S.E.2d 43, 49–50 (W. Va. 2019) (quoting *Skaggs v. Elk Run Coal Co.*, 479 S.E.2d 561, 575 (W. Va. 1996)). The district court found that Coffman did not meet prong four: she failed to present a reasonable accommodation that met her needs.

5

Because "reasonableness" is a case-specific inquiry, Coffman argues that the district court erred by taking the prong four analysis away from the jury. *See Haynes v. Rhone-Poulenc, Inc.*, 521 S.E.2d 331, 344 (W. Va. 1999) ("the process of determining what constitutes reasonable accommodation in a particular case [is] flexible, in order to balance the interests of the employee in continued employment and the interests of the employer in avoiding unreasonable burdens or expenses"). We disagree. "Although determination of the reasonableness of a proposed [accommodation] is often fact-specific," courts may strike down accommodations at the summary judgment stage for a number of reasons, including that the accommodation is not "reasonable on its face." *Halpern v. Wake Forest Univ. Health Scis.*, 669 F.3d 454, 464 (4th Cir. 2012) (quoting *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 401–02 (2002)).[1]

Ultimately, we agree with the district court that each of Coffman's accommodations is not reasonable on its face. She proposes three accommodations: (1) unpaid leave; (2) paid parental leave; and (3) remote work. We examine them below.

i.

First, we consider unpaid leave. The district court found that this accommodation was not reasonable because, at the time of her termination, Coffman had been absent for six months and could not provide an approximate return-to-work date. We agree.

---

[1] At times, this opinion relies on case law examining the Americans with Disabilities Act (ADA). *See* 42 U.S.C. § 12101 *et seq.* This case law is "instructive" as "the rights under the ADA and the WVHRA are coextensive." *Burns*, 836 S.E.2d at 49 n.7.

6

"Nothing in the text of the reasonable accommodation provision requires an employer to wait an indefinite period for an accommodation to achieve its intended effect. Rather, reasonable accommodation is by its terms most logically construed as that which presently, or in the immediate future, enables the employee to perform the essential functions of the job in question." *Myers v. Hose*, 50 F.3d 278, 283 (4th Cir. 1995). Simply put, an employer is not required "to give a disabled employee 'an indefinite period of time to correct [a] disabling condition' that renders him unqualified." *Halpern*, 669 F.3d at 465 (quoting *Myers*, 50 F.3d at 280).

Coffman's original return-to-work date came and passed on June 27. About a month later, Nexstar asked for a new return date. Coffman responded by email: "As I have previously stated …, I am still under intense care by my healthcare team…. I have surgery …. August 8" with a "recovery time [of] generally 4-6 weeks," and "I have an additional surgery October (tentatively)." J.A. 184. This exchange clearly communicates an indefinite period of recovery: Coffman might recover in about four-to-six weeks, but a tentative follow-up surgery remains scheduled.

Coffman claims that this level of uncertainty is not meaningful. She emphasizes that our case law does not require an employee to provide a precise return date. While true, this does not change our outcome. The debate here does not concern whether Coffman will return on August 10th or 15th. The debate concerns whether she can return at any point in the near future. Five months into her absence, the best she could offer was: "[I] probably [will] be released in September or October." Opening Br. 24. While the Court is sympathetic to Coffman's injuries, we do find this level of uncertainty meaningful.

7

At bottom, indefinite leave is not a reasonable accommodation, and, here, unpaid leave amounted to indefinite leave. *See Halpern*, 669 F.3d at 465 ("the indefinite duration and uncertain likelihood of success of Halpern's proposed accommodation renders it unreasonable"); *Myers*, 50 F.3d at 283 ("reasonable accommodation does not include duty to await uncertain results") (citing *Fuller v. Frank*, 916 F.2d 558, 562 (9th Cir. 1990)); *Haynes*, 521 S.E.2d at 344 n.17 ("by disabling condition, we refer to a totally disabling medical condition of *limited* duration") (emphasis added). Therefore, Coffman's proposed accommodation of unpaid leave is not reasonable on its face.

ii.

Next, we examine paid parental leave. We find that paid leave is not reasonable for the same reason that unpaid leave is not reasonable (i.e., under the WVHRA, employers are not required to give employees indefinite periods of time to cure disabling conditions).

Moreover, the record shows that Coffman did not actually qualify for Nexstar's paid parental leave program. Terri Bush, Nexstar's Associate General Counsel and Senior Vice President of Human Resources, testified that Nexstar offers up to six weeks of paid parental leave "[a]fter short-term disability is over." J.A. 61 ("We make the participants exhaust their short-term disability benefits before the paid parental leave."). She added: because "[Coffman] never returned from disability," "she wouldn't have achieved it." J.A. 65.

Coffman does not refute that she was ineligible for paid parental leave. In fact, she emphasizes it: Coffman argues that she was terminated "while she was receiving disability benefits so that she would not be eligible to receive paid parental leave." Opening Br. 23.

8

But this argument does not hold water: Coffman cannot use Nexstar's refusal to provide one unwarranted accommodation (additional unpaid leave) to bolster her need to receive a second (paid parental leave). Therefore, Coffman's proposed accommodation of paid parental leave is not reasonable on two separate but related grounds.

iii.

Finally, we turn to remote work. The district court found that this accommodation was not reasonable because Coffman "failed to demonstrate that, at the time of her August 2022 termination, she was able to work at all, whether in person or remotely." J.A. 254. We agree.

To begin, the parties dispute whether Coffman ever requested to work remotely after she gave birth. Coffman claims that she made this request in "mid to late April to May," which Nexstar denies. J.A. 146. But, assuming the request was made, its existence does not help Coffman because the record demonstrates an inability to follow through, i.e., an inability to actually work remotely.

Although Coffman disagrees, she neglects to present any evidence indicating otherwise. Instead, she argues that her ability to work remotely *before* giving birth demonstrates her ability to work remotely *after* giving birth. But this claim is easily rejected. As Coffman's own briefing explains: "During [her] c-section, an attending physician cut her ureter. Consequently, Coffman developed serious complications, including infections, hospitalizations and multiple surgeries." Opening Br. 2. Coffman's

9

condition before giving birth therefore tells us little about her condition after giving birth, and we must turn to the record to understand the extent of her recovery.

According to the record, following the twins' delivery in late February, Coffman instructed Nexstar in late June: "Please do not contact me regarding a return to work date when I have been classified as unable to return and still have shortterm disability plus bonding leave." J.A. 174. She repeated much of the same in early August: "I am still under intense care by my healthcare team. I have surgery … [on] August 8th," and "I have an additional surgery [in] October (tentatively)." J.A. 184.

Coffman now claims that her statements about an inability to work were limited to in-person work. But, for one, a plain reading of her communications does not support this. And, for another, Coffman acknowledges that she remained on short-term disability through the day of her termination. Short-term disability is provided to employees who are classified as completely unable to work. *See* J.A. 57–62 (Nexstar's Associate General Counsel and Senior Vice President of Human Resources explaining that "until [Coffman's] released from disability… she's not able to work" in any capacity).

As a result, we find that the record demonstrates a difficult and lengthy recovery process for Coffman—one that left her unable to work, whether in-person or remotely, until after her termination. Because Coffman was unable to work remotely, her proposed accommodation of remote work is not reasonable on its face.[2]

---

[2] Because we find that Coffman was unable to work remotely, we do not examine whether remote work would have fulfilled the essential functions of her position.

10

iv.

In sum, we agree with the district court that each of Coffman's proposed accommodations is not reasonable on its face. And, without evidence of a reasonable accommodation that met her needs, Coffman's claim fails. *See Alley v. Charleston Area Med. Ctr., Inc.*, 602 S.E.2d 506, 516 (W. Va. 2004) (plaintiff must show that "some accommodation was possible") (quoting *Skaggs*, 479 S.E.2d at 575 n.11); *Burns*, 836 S.E.2d at 50 (outlining required prongs); *Hannah v. United Parcel Serv., Inc.*, 72 F.4th 630, 636 (4th Cir. 2023) ("Hannah has not carried his burden of demonstrating that the accommodations he requested were reasonable.").

Coffman pursues one alternative argument, however. She claims that Nexstar is liable for failing to engage in the interactive accommodation process (i.e., for failing to respond to her remote-work request). Coffman is correct that "[t]he duty to engage in an interactive process to identify a reasonable accommodation is generally triggered when an employee communicates to [her] employer [her] disability and [her] desire for an accommodation for that disability." *Wilson v. Dollar Gen. Corp.*, 717 F.3d 337, 346–47 (4th Cir. 2013) (citing cases). "But the interactive process 'is not an end in itself; rather it is a means for determining what reasonable accommodations are available to allow a disabled individual to perform the essential job functions of the position sought.'" *Id.* (quoting *Rehling v. City of Chi.*, 207 F.3d 1009, 1015 (7th Cir. 2000)).

Therefore, "an employer will not be liable for failure to engage in the interactive process if the employee ultimately fails to demonstrate the existence of a reasonable

11

accommodation that would allow her to perform the essential functions of the position."
*Perdue v. Sanofi-Aventis U.S., LLC*, 999 F.3d 954, 962 (4th Cir. 2021) (quoting *Jacobs v. N.C. Admin. Off. of the Cts.*, 780 F.3d 562, 581 (4th Cir. 2015)).   Applied here: "As [Coffman] fails to demonstrate the existence of a reasonable accommodation, [Nexstar] cannot separately be liable for failing to engage in the interactive process." *Id.*; *see Wilson*, 717 F.3d at 347 (recognizing same).

## B.

Next, we assess Coffman's WHVRA discriminatory discharge claim.  To succeed on such a claim, a plaintiff must first make a prima facie case that "(1) he or she meets the definition of having a 'disability,' (2) he or she is a 'qualified individual with a disability,' and (3) he or she was discharged from his or her job." *Woods v. Jefferds Corp.*, 824 S.E.2d 539, 547 (W. Va. 2019) (internal brackets omitted) (quoting *Morris Mem'l Convalescent Nursing Home, Inc. v. W. Va. Hum. Rts. Comm'n*, 431 S.E.2d 353, 357 (W. Va. 1993)). The district court found that Coffman did not meet prong two: she failed to show that she is a qualified individual with a disability.  We agree.

Under the WVHRA, "[a] 'qualified individual with a disability' … is one who is able and competent, *with reasonable accommodation*, to perform the essential functions of the job in question." *Id.* at 546, 551 (internal brackets omitted) (quoting *Coffman v. W. Va. Bd. of Regents*, 386 S.E.2d 1, 4 (W. Va. 1988), *overruled on other grounds by Skaggs*, 479 S.E.2d at 579).  As discussed in Section II.A., Coffman fails to demonstrate that such an

12

accommodation existed.  She therefore is not a "qualified individual with a disability" and cannot meet an essential element of her discriminatory discharge claim.[3]

C.

We next turn to Coffman's WVHRA retaliatory discharge claim.  To succeed on such a claim, a plaintiff must first make a prima facie case:

> (1) that the complainant engaged in protected activity, (2) that complainant's employer was aware of the protected activities, (3) that complainant was subsequently discharged and (absent other evidence tending to establish a retaliatory motivation), (4) that complainant's discharge followed his or her protected activities within such period of time that the court can infer retaliatory motivation.

*Roth v. DeFeliceCare, Inc.*, 700 S.E.2d. 183, 193 (W. Va. 2010) (quoting *Frank's Shoe Store v. W. Va. Hum. Rts. Comm'n*, 365 S.E.2d 251, 259 (W. Va. 1986)).

The district court found that Coffman did not meet prong one: she failed to show that she engaged in "protected activity."  More specifically, the district court held that, because Coffman "failed to demonstrate any of her proffered accommodations … were reasonable at termination," she did not actually request a "reasonable" accommodation and therefore did not engage in "protected activity."  J.A. 260.

---

[3] Because Coffman does not make a prima facie case, we do not address arguments that speak to later stages of this claim's burden-shifting framework, e.g., arguments about whether Nexstar's proffered reason for her termination is a mere pretext. *See Woods*, 824 S.E.2d at 547–48 (recognizing that the WVHRA incorporates the burden-shifting framework outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)).

13

This holding may have been error. *See Kelley v. Mayorkas*, 694 F. Supp. 3d 715, 730 (E.D. Va. 2023) (finding that courts disagree as to whether "a request for accommodation that is not reasonable is … a protected activity") (citing cases). But Coffman does not contest this holding: she argues that her proposed accommodations were reasonable but never disputes that her requests must *be* reasonable to qualify as protected activity. The parties therefore did not brief this issue.[4]

Ultimately, we agree with the district court that Coffman did not request a "reasonable" accommodation, and we have long held that "[f]ailure to present or argue assignments of error in opening appellate briefs constitutes a waiver of those issues." *IGEN Int'l, Inc. v. Roche Diagnostics GmbH*, 335 F.3d 303, 308–09 (4th Cir. 2003) (declining to consider waived argument despite being "inclined to believe" the district court erred); *see also* Fed. R. App. P. 28(a)(8)(A). We therefore affirm the judgment of the district court and do not address arguments that speak to Nexstar's motive (i.e., a later prong in the WVHRA retaliatory discharge analysis).

### D.

Finally, we examine Coffman's FMLA retaliatory discharge claim. To succeed on such a claim, a plaintiff must first make a prima facie case that: "(1) [they] engaged in a

---

[4] Coffman also does not argue that the district court erred by failing to consider whether any other activities qualified as "protected activities" under the WVHRA. In fact, it is difficult to decipher what assignments of error (if any) Coffman pursues with respect to prong one.

14

protected activity; (2) [their] employer took an adverse employment action against [them]; and (3) there was a causal link between the two events." *Roberts v. Gestamp W. Va., LLC*, 45 F.4th 726, 738 (4th Cir. 2022) (quoting *Hannah P. v. Coats*, 916 F.3d 327, 347 (4th Cir. 2019)). The district court found that the first two prongs were not in dispute: Coffman took FMLA leave (a protected activity) and was terminated (an adverse employment action). But the court went on to conclude that Coffman did not meet prong three: she failed to show the required "causal link between the two events." We agree.[5]

As the district court recognized, "Nexstar permitted Ms. Coffman to take FMLA leave when she wanted and without issue. Indeed, Nexstar gave her an additional twelve weeks of leave after her guaranteed initial twelve weeks of FMLA leave expired in May 2022." J.A. 259. As a result, three months passed between the end of Coffman's FMLA leave (May 17) and her termination (August 19). This timeline undermines any inference of causation. *See King v. Rumsfeld*, 328 F.3d 145, 151 n.5 (4th Cir. 2003) (Under the FMLA, "two months and two weeks … is sufficiently long so as to weaken significantly the inference of causation between the two events."); *Ranade v. BT Americas, Inc.*, 581 Fed. Appx. 182, 183 (4th Cir. 2014) (unpublished) (recognizing same).

Without the aid of a sufficiently close timeline, Coffman turns to a statement from Nexstar's Local Sales Manager that the company was "trying to keep [her] off of FMLA." J.A. 137. But this statement does little work for Coffman. During her deposition, she

---

[5] Again, Coffman does not explicitly argue that FMLA leave is a "protected activity" under the WVHRA. *See supra* Note 4. To the extent that this is implied, her WVHRA retaliation claim would fail for the reasons provided in this section.

15

conceded that the statement was made "early in [her pregnancy]" and that she, too, wanted to wait to use her FMLA leave. *See* J.A. 137–38 ("Was it beneficial for me?  Yes, because I would have had the FMLA after I had the twins.").  Because this is the sole argument that Coffman uses to demonstrate the required "causal link," we agree with the district court that her claim fails.

## III.

Based on the foregoing, we affirm the judgment of the district court.

*AFFIRMED.*