**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

LAMONT WILSON,

       *Plaintiff-Appellant,*

v.

DOLLAR GENERAL CORPORATION;
DOLGENCORP, LLC; DOLGEN, LLC,

       *Defendants-Appellees.*

No. 12-1573

Appeal from the United States District Court
for the Western District of Virginia, at Danville.
Jackson L. Kiser, Senior District Judge.
(4:11-cv-00024-JLK-RSB)

Argued: March 22, 2013

Decided: May 17, 2013

Before NIEMEYER, AGEE, and THACKER,
Circuit Judges.

Affirmed by published opinion. Judge Thacker wrote the
opinion, in which Judge Niemeyer and Judge Agee joined.

## COUNSEL

**ARGUED:** Terry Neill Grimes, GRIMES & WILLIAMS,
PC, Roanoke, Virginia, for Appellant. Douglas D. Haloftis,
GARDERE, WYNNE & SEWELL, LLP, Dallas, Texas, for

Appellees. **ON BRIEF:** Stacy R. Obenhaus, Slates C. Veazey, GARDERE, WYNNE & SEWELL, LLP, Dallas, Texas; Agnis C. Chakravorty, WOODS ROGERS, Roanoke, Virginia, for Appellees.

**OPINION**

THACKER, Circuit Judge:

In the present case, Lamont Wilson ("Appellant" or "Wilson") filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") against his employer, Dollar General Corporation ("Appellee" or "Dollar General"). Wilson alleged Dollar General failed to provide a reasonable accommodation for his disability in violation of the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101–12213 ("ADA").

While awaiting the EEOC's notice of his right to sue, Appellant Wilson filed for Chapter 13 bankruptcy. He then filed the present suit in district court, and Dollar General moved for summary judgment. Dollar General argued, unsuccessfully, that the filing of Wilson's Chapter 13 bankruptcy petition deprived Wilson of standing to maintain his ADA claim. Dollar General also argued, and the district court agreed, that Wilson's claim failed on the merits. Wilson appealed the district court's determination that although he had standing to maintain his claim, his claim failed on the merits.

We align ourselves with our sister circuits and conclude that because of the powers vested in the Chapter 13 debtor and trustee, a Chapter 13 debtor may retain standing to bring his pre-bankruptcy petition claims. We also conclude that because Appellant was unable to show he could perform the essential functions of his position with a reasonable accom-

modation, the district court properly granted summary judgment in Dollar General's favor. Accordingly, we affirm the judgment of the district court.

## I.

Wilson is a former employee of Dollar General. In his youth, long before his employment with Dollar General, Wilson suffered a detached retina in his right eye, causing complete and permanent blindness in his right eye.

In September 2009, Wilson began working at one of Dollar General's distribution centers, located in South Boston, Virginia. Wilson worked the night shift, processing inventory and loading merchandise for transportation to Dollar General's many retail locations. His responsibilities included sorting smaller products as well as lifting and loading heavier products. By all accounts, Wilson was an excellent employee. He was chosen to serve in an unpaid capacity as Head Employee Safety Representative, acting as a liaison between employees and management on matters of employee safety and working conditions. His work ethic is unchallenged — a testament to his industriousness, perseverance, and good nature, despite his physical limitation.

Unfortunately, within five months of gaining employment with Dollar General, in February 2010, Wilson developed a serious inflammatory condition in his left eye. Threatened with the prospect of losing his vision entirely, Wilson sought immediate treatment at the Dominion Eye Center in Danville, Virginia. Dr. Crews of the Dominion Eye Center diagnosed Wilson with iritis.[1] Dr. Crews initially prescribed eye drops and advised that Wilson refrain from strenuous activities. As a side effect of the prescription eye drops, Wilson's vision became blurred, further limiting his abilities.

---

[1]Iritis is a medical condition characterized by inflammation of the iris. Its symptoms may include redness, pain, diminished visual acuity, and even blindness. *See Stedman's Medical Dictionary* 1000 (28th ed. 2006).

With the onset of his medical condition in February 2010, Wilson took leave from his position with Dollar General. During his leave, Wilson continued to receive treatment from doctors at the Dominion Eye Center, including his primary physician, Dr. Odom. Wilson also continuously provided Dollar General with notes from Drs. Odom and Crews dated February 12, February 14, February 15, February 19, February 26, and March 5, indicating he was still receiving treatment and was unable to return to work. Dollar General initially granted Wilson six weeks of leave pursuant to its medical leave policy, followed by two weeks of additional medical leave.[2] At the conclusion of Wilson's treatment, Wilson again received eye drops and Dr. Odom cleared Wilson to "return to work as of today 4-6-10." J.A. 313.[3] Dr. Odom's April 6 note did not indicate whether Wilson's return should have been subject to any restrictions.

The night of April 6, 2010, however, Wilson's vision did not fully return and instead remained blurred. That night, Wilson called Dollar General's human resource officer Niki Stinespring to inform Dollar General of his condition. Wilson explained to Stinespring that although earlier in the afternoon he had been cleared to return to work by his doctor, he was still having significant problems with his vision that prevented his return to work that night. Dollar General then granted Wilson an additional day of leave and permitted him to return to work on April 7.

Wilson's condition worsened, and on April 7, he sought treatment from Dr. Hoang at the emergency room of the Danville Regional Medical Center. Dr. Hoang treated Wilson with additional eye drops and prescription pain medication, but Wilson's vision problems did not subside.

---

[2]Not having worked for Dollar General for at least 12 months with at least 1,250 hours of service, Wilson was ineligible for leave under the Family and Medical Leave Act. *See* 29 U.S.C. § 2611(2)(A).

[3]Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

Immediately after receiving treatment at Danville Regional Medical Center on April 7, Wilson traveled to Dollar General's facility. Wilson informed Stinespring that he would be unable to return to work that evening as he had previously indicated. Wilson provided Stinespring with Dr. Hoang's Patient Discharge Instructions note, which read: "This notice verifies that your employee, Lamont Wilson was seen in this facility on _040710_[.] He/she may return to work on _040910_. . . ." J.A. 218. Dr. Hoang's note left blank a section identifying whether or not Wilson's return to work was subject to any restrictions. The note concluded with the following boilerplate instruction: "If symptoms continue and the employee is unable to perform the full duties of their job by this date, please advise the employee to return to this facility or make an appointment with the referral physician for further evaluation." *Id.* Wilson also informed Stinespring that he had additional upcoming medical appointments with the Duke Medical Center to help treat his condition.

According to Wilson, Stinespring responded by offering him an ultimatum: return to work that evening on April 7 as he previously indicated he would; or be terminated and reapply after his condition improved. Wilson then admitted that he was unable to return to work that evening. At this point, it became clear to Wilson that he had been terminated.[4]

Following his termination, Wilson's vision did not immediately improve. Wilson testified that he was unable to "specifically give you a date" as to when he would have been able to return to work at Dollar General. J.A. 144. He did, however, begin making other job contacts, as a condition to receive state unemployment benefits, approximately "a week [or a] week and a half later," after his termination on April 7. *Id.*

---

[4]Dollar General's records indicate, that for its own administrative purposes, Wilson's termination was officially processed on April 14, 2010. Wilson alleges, however, that Dollar General made its decision to fire him, and thus effectively terminated his employment, on April 7.

Shortly after his termination, Wilson contacted the EEOC and inquired about his options for legal recourse. On June 10, 2010, Wilson filed a charge of discrimination. Later that month, on June 27, Wilson filed for Chapter 13 bankruptcy in the Western District of Virginia.

During the course of his bankruptcy proceeding, Wilson filed an amended Schedule B with the bankruptcy court, identifying his personal property. The schedule included as Wilson's personal property, a "Potential Claim against Dollar General related to termination of Debtor's employment, value, if any unknown." Amended Schedule B – Pers. Prop., *In re Wilson*, No. 10-61863 (Bankr. W.D. Va. Oct. 19, 2010), ECF No. 31. On November 10, 2010, Wilson's Chapter 13 bankruptcy plan was confirmed.[5]

Around the same time, Wilson suffered a second medical setback; he was diagnosed with a detached retina in his left eye that required surgery. On November 22, 2010, Wilson underwent surgery at the University of Virginia Medical Center to repair his detached retina. The surgery left Wilson blind for seven weeks, and required months of rest and recovery thereafter. Eventually, Wilson's vision returned, he recovered from the surgery, and in March 2011 he began looking for employment.

On March 31, 2011, the EEOC issued Wilson a notice of his right to sue Dollar General. On June 15, 2011, Wilson filed the suit underlying this appeal in the Western District of Virginia. Wilson alleged Dollar General had unlawfully discriminated against him by failing to provide a reasonable accommodation for his disability, resulting in his discharge, in violation of the ADA.

---

[5]After Wilson initially fell into default, the bankruptcy court confirmed his Modified Chapter 13 plan on September 15, 2011.

On February 7, 2012, Dollar General moved in district court for summary judgment on Wilson's ADA claim. Dollar General argued Wilson, as a Chapter 13 debtor, lacked standing to maintain his pre-petition claim and, therefore, the district court lacked subject matter jurisdiction to hear Wilson's claim. Dollar General also argued Wilson failed to establish genuine issues of material fact as to his underlying ADA claim. On March 5, 2012, the district court by memorandum opinion, denied Dollar General's motion with respect to standing. The district court granted summary judgment, however, in Dollar General's favor as to the underlying ADA claim. Wilson filed a motion to reconsider, which was denied on April 5, 2012. Wilson then timely filed this appeal.

## II.

As the district court's grant of summary judgment was a final order disposing of Wilson's claims, we possess jurisdiction over his appeal pursuant to 28 U.S.C. § 1291.

We review de novo the legal question of whether a plaintiff has standing to maintain his cause of action. *Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 553 (4th Cir. 2013); *see Smith v. Rockett*, 522 F.3d 1080, 1081 (10th Cir. 2008) (reviewing de novo Chapter 13 debtor's standing to maintain claims under the Fair Debt Collections Practices Act, 15 U.S.C. §§ 1692–1692p, and various state laws).

We also review de novo a district court's grant of summary judgment, viewing all the evidence and reasonable inferences drawn therefrom in the light most favorable to the nonmovant. *Halpern v. Wake Forest Univ. Health Scis.*, 669 F.3d 454, 460 (4th Cir. 2012). Summary judgment is appropriate if there are no genuine disputes of material fact and the moving party is entitled to judgment as a matter of law. *Id.*

## III.

First, given that Appellant's standing was challenged below, the district court addressed standing in its opinion

granting summary judgment, and because this court has not yet considered to what extent a Chapter 13 debtor may possess standing to assert an independent cause of action, we find it appropriate to lay the issue to rest here. Second, because we conclude Wilson retained standing, once he filed for Chapter 13 bankruptcy, to file his pre-petition ADA claim for unlawful discrimination, we then consider whether the district court erred in concluding Dollar General was entitled to summary judgment on Wilson's ADA claim.

## A.

### 1.

The threshold issue here is whether Wilson, as a Chapter 13 debtor, retained standing to file his cause of action under the ADA.

We begin our analysis by acknowledging a few basic bankruptcy principles. The filing of a bankruptcy petition creates a bankruptcy estate. 11 U.S.C §§ 301, 541(a). The bankruptcy estate is comprised of a broad range of both tangible and intangible property interests. *Id.* § 541(a). Such property interests include non-bankruptcy causes of action that arose out of events occurring prior to the filing of the bankruptcy petition. *See Wissman v. Pittsburgh Nat'l Bank*, 942 F.2d 867, 869 (4th Cir. 1991). While the bankruptcy code is silent as to the debtor's capacity to maintain these non-bankruptcy causes of action, the bankruptcy trustee, as representative of the estate, 11 U.S.C. § 323(a), generally "has capacity to sue and be sued." *Id.* § 323(b).

As a result, in the Chapter 7 bankruptcy context — which requires liquidation and distribution of assets by the trustee — we have recognized, "[i]f a cause of action is part of the estate of the bankrupt then the trustee alone has standing to bring that claim." *Nat'l Am. Ins. Co. v. Ruppert Landscaping Co.*, 187 F.3d 439, 441 (4th Cir. 1999). We have applied this prin-

ciple to causes of action that are part of the estate when brought by creditors and by Chapter 7 debtors alike. *See id.*; *Tignor v. Parkinson*, 729 F.2d 977, 981 (4th Cir. 1984), *superseded by statute*, Va. Code Ann. § 34-28.1 (West 2012), *as recognized in In re Cassell*, 1994 WL 177416 at \*2, 23 F.3d 400 (4th Cir. 1994) (unpublished table decision); *see also In re Richman*, 104 F.3d 654, 657 (4th Cir. 1997) (citing *Stanley v. Sherwin-Williams Co.*, 156 B.R. 25, 26 (W.D. Va. 1993)).[6]

But the breadth of our precedent has been limited. We have only considered the abilities of Chapter 7 debtors and trustees to maintain non-bankruptcy causes of action that are part of the estate. We have not yet considered to what extent the Chapter 13 debtor — who, unlike the Chapter 7 debtor, retains possession of the bankruptcy estate — may also possess standing to assert a cause of action, either exclusive of, or concurrent with, the authority vested in the trustee.

All of the five circuit courts to have considered the question have concluded that Chapter 13 debtors have standing to bring causes of action in their own name on behalf of the estate. *See Smith v. Rockett*, 522 F.3d 1080, 1082 (10th Cir. 2008); *Crosby v. Monroe Cnty.*, 394 F.3d 1328, 1331 n.2 (11th Cir. 2004); *Cable v. Ivy Tech State College*, 200 F.3d 467, 472–74 (7th Cir. 1999); *Olick v. Parker & Parsley Petroleum Co.*, 145 F.3d 513, 515–16 (2d Cir. 1998); *Mar. Elec. Co. v. United Jersey Bank*, 959 F.2d 1194, 1209 n.2 (3d Cir. 1992) (Opinion Sur Panel Rehearing), *reinstating Mar. Elec. Co. v. United Jersey Bank*, 959 F.2d 1194 (3d Cir. 1991); *see also Love v. Tyson Foods, Inc.*, 677 F.3d 258, 269 & n.6 (5th Cir. 2012) (Haynes, J., dissenting) (rejecting the majority's equitable estoppel analysis).

---

[6]*See also Miller v. Pac. Shore Funding*, 92 F. App'x 933, 937 (4th Cir. 2004).

We find the authority of our sister circuits persuasive and conclude that, unlike a Chapter 7 debtor, a Chapter 13 debtor possesses standing — concurrent with that of the trustee — to maintain a non-bankruptcy cause of action on behalf of the estate. The nature of Chapter 13 bankruptcy when compared to Chapter 7 supports this conclusion.

2.

Chapter 7 and Chapter 13 provide two distinct methods for an individual to cure his indebtedness. Chapter 7 adopts the "much more radical solution," *Cable*, 200 F.3d at 472, of requiring the debtor to relinquish possession of the estate to the trustee for liquidation and distribution to creditors. *See* 11 U.S.C. § 704. To effectuate this purpose, the trustee's management of the estate — including causes of action that are part of the estate — must necessarily be free from interference by the debtor. *Cable*, 200 F.3d at 472. Thus, under Rule 17's real-party-in-interest requirement, it is the Chapter 7 trustee, but not the Chapter 7 debtor, who may possess standing on behalf of the estate to bring a pre-petition claim. *See, e.g., Auday v. Wet Seal Retail, Inc.*, 698 F.3d 902, 904–06 (6th Cir. 2012) (concluding Chapter 7 debtor lacked standing to maintain age discrimination suit against her former employer but remanding to district court to determine whether Rule 17 permitted the Chapter 7 trustee to join or substitute itself into the action); *Dunmore v. United States*, 358 F.3d 1107, 1111–13 (9th Cir. 2004) (concluding the Chapter 7 estate was the real party in interest and thus Chapter 7 debtor lacked prudential standing to maintain action for refund of federal taxes, but remanding to the district court to determine whether debtor could cure his Rule 17 defect).

Chapter 13, however, provides a different framework. Under Chapter 13, the debtor remains in possession of the property of the estate and cures his indebtedness, under the supervision of the trustee, by way of regular payments to

creditors from his earnings through a court approved payment plan. *See* 11 U.S.C. §§ 1306(b), 1322; *Olick*, 145 F.3d at 516.

Chapter 13 also modifies other powers generally given to the debtor and trustee. For example, not only does the Chapter 13 debtor retain possession of the property of the estate, the Chapter 13 debtor also assumes "exclusive of the trustee, the rights and powers of a trustee[,]" 11 U.S.C. § 1303, found in many of the provisions of § 363 regarding the general administration of bankruptcy estates. In other words, in addition to his power to possess property, the Chapter 13 debtor is explicitly given the authority, exclusive of the trustee, to use, sell, or lease property of the estate in certain circumstances. As the Seventh Circuit recognized, "[i]t would frustrate the essential purpose of § 1306 to grant the debtor possession of the chose in action yet prohibit him from pursuing it for the benefit [of] the estate." *Cable*, 200 F.3d at 473.

Implicit in that act of possession, as authorized by statute, is the right of the Chapter 13 debtor — unlike the Chapter 7 debtor — to sue in his own name in such actions pursuant to Rule 17(a) of the Federal Rules of Civil Procedure. *See* Fed. R. Civ. P. 17(a)(1)(G) (permitting "a party authorized by statute" to sue in his or her own name without joining the person for whose benefit the action is brought). Accordingly, because the Chapter 13 debtor is explicitly given the power to possess and use the property, and implicit within that use is the permissible maintenance of a cause of action that is part of the estate, the Chapter 13 debtor has standing to maintain a pre-petition claim.

Federal Rule of Bankruptcy Procedure 6009 envisions the same result. Under Rule 6009 "the trustee or debtor in possession may prosecute or may enter an appearance and defend any pending action or proceeding by or against the debtor . . . ." Fed. R. Bankr. P. 6009; *see Smith*, 522 F.3d at 1082 & n.2 (recognizing that although "debtor in possession" is a term of art in the Chapter 11 context, a Chapter 13 debtor possesses

the Chapter 13 estate and has thus been considered analogous to a Chapter 11 debtor due to their enhanced representative and operational capacities); *Cable*, 200 F.3d at 472 (same). In this sense, the Chapter 13 debtor "steps into the role of trustee and exercises concurrent authority to sue and be sued on behalf of the estate." *Cable*, 200 F.3d at 473 (citing Fed. R. Bankr. P. 6009).

Therefore, we find Wilson had standing in the district court to bring his pre-Chapter 13 claim for violation of the ADA.

### B.

We now turn to the merits of Wilson's appeal. The ADA performs a number of laudatory functions, not the least of which is to protect disabled individuals from insidious discrimination by requiring employers to reasonably accommodate their disability. The law, however, cannot remedy every misfortune. It can only correct that which it prescribes to correct.

Under the ADA, an employer is prohibited from "discriminat[ing] against a qualified individual on the basis of disability . . . ." 42 U.S.C. § 12112(a). Such unlawful discrimination can include the failure to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee . . . ." *Id.* § 12112(b)(5)(A).

For purposes of the ADA, "reasonable accommodations" may comprise "job restructuring, part-time or modified work schedules," 42 U.S.C. § 12111(9)(B), and "permitting the use of accrued paid leave or providing additional unpaid leave for necessary treatment . . . ." 29 C.F.R. § 1630.2(o) (Appendix) (2011).

A "qualified individual" is "an individual who, with or without reasonable accommodation, can perform the essential

functions of the employment position . . . ." 42 U.S.C. § 12111(8).

Accordingly, in order for a plaintiff to establish a prima facie case against his employer for failure to accommodate under the ADA, the plaintiff must show: "'(1) that he was an individual who had a disability within the meaning of the statute; (2) that the [employer] had notice of his disability; (3) that with reasonable accommodation he could perform the essential functions of the position . . . ; and (4) that the [employer] refused to make such accommodations.'" *Rhoads v. Fed. Deposit Ins. Corp.*, 257 F.3d 373, 387 n.11 (4th Cir. 2001) (quoting *Mitchell v. Washingtonville Cent. Sch. Dist.*, 190 F.3d 1, 6 (2d Cir. 1999)).

In this case, the district court found, and Dollar General has not disputed on appeal, that Wilson satisfied the first two elements of his prima facie case — that is, (1) he had a disability within the meaning of the statute, and (2) Dollar General was on notice of his disability. This case turns, then, on whether Wilson satisfied the third element: that he was a qualified individual under the ADA, such that had he been given a reasonable accommodation, he could have "perform[ed] the essential functions of the employment position . . . ." 42 U.S.C. § 12111(8).

1.

Here, as indicated by Dr. Hoang's note, Wilson requested two days of additional leave from April 7, 2010, to April 9, 2010. According to Wilson, the vast majority of Dr. Hoang's note is mere boilerplate language of little value. But importantly, at a minimum, the information clearly specific to Wilson's medical discharge includes the date Dr. Hoang stated Wilson could return to work: April 9, 2010.

Because the crux of this case is whether or not Appellant Wilson was a qualified individual, we assume, without decid-

ing, that Wilson's two-day leave request was not unreasonable on its face, in accordance with our holdings in *Halpern v. Wake Forest University Health Sciences*, 669 F.3d 454 (4th Cir. 2012), and *Myers v. Hose,* 50 F.3d 278 (4th Cir. 1995).[7]

2.

The reasonableness of Wilson's request is but part of our inquiry. Wilson must also show that with this accommodation he was a qualified individual — that is, he could have performed the essential functions of his position. *See* 42 U.S.C. § 12111(8).

A reasonable accommodation request for prospective leave to alleviate an intermittent disability presents unique challenges for the employee. There is an inherent tension between the accommodation and the employee's ability to later show he could have performed the essential functions of his position with such accommodation. This is in part because the accommodation itself is fleeting, and, thus, the inquiry is necessarily limited and retrospective. The employee must show that had he been granted leave, at the point at which he would have returned from leave, he could have performed the essential functions of his job.[8]

---

[7]Under *Halpern* and *Myers*, a leave request will not be unreasonable on its face so long as it (1) is for a limited, finite period of time; (2) consists of accrued paid leave or unpaid leave; and (3) is shown to be likely to achieve a level of success that will enable the individual to perform the essential functions of the job in question. *See Halpern*, 669 F.3d at 465–66; *Myers*, 50 F.3d at 283.

[8]In determining whether leave would or would not have enabled an individual to perform the essential functions of a position, it is improper to consider, as the district court did here, evidence of the individual's abilities beyond his or her proposed return date. In leave cases, the accommodation must be for a *finite* period of leave. *See Halpern*, 669 F.3d at 465–66. Once that period lapses, it then becomes apparent whether the withheld accommodation would have been successful or futile. Evidence indicating that weeks or even months after the individual's proposed

Here, Wilson has not identified a possible reasonable accommodation, other than leave, that would have enabled him to perform the essential functions of his position; nor has Wilson produced evidence that had he been granted such leave, he could have performed the essential functions of his position on his requested return date, April 9, 2010. Indeed, Wilson conceded that he was unable to return to work on April 9.

At most, Wilson testified that he was eventually able to begin to *look for* work approximately "a week, week and a half later" because he was able to go out in public and locate his prior job contacts, at least in part, to maintain eligibility for unemployment benefits. J.A. 144. But as the district court noted, an ability to contact prior employers at a later date is not probative of an ability to perform the essential functions of one's specific job with one's current employer at the time the accommodation would have expired. Wilson did not provide any evidence that on April 9 he was able to lift and load objects of various weights, as would have been required by his position at Dollar General. Wilson also did not provide any medical or other evidence, indicating that on April 9 he was cleared and able to perform these tasks. Indeed, Dr. Hoang's note was silent in this regard. In sum, there is simply no evidence to conclude that had Wilson been accommodated with his two-day leave request, he would have been able to perform the essential functions of his job at the conclusion of the leave period.

3.

With respect to the fourth element of Wilson's prima facie case — that Dollar General refused to provide a reasonable

return date, the individual became able or unable to work, is untethered to the initial request. Accordingly, evidence Wilson later suffered an additional medical setback and could not return to work until a year later, is irrelevant to the question of whether he could have performed the essential functions of his position if given two days of leave.

accommodation — Wilson also argues Dollar General failed to engage in an interactive process to identify a reasonable accommodation. *See Haneke v. Mid-Atlantic Capital Mgmt.*, 131 F. App'x 399, 400 (4th Cir. 2005).

In defining "reasonable accommodation," the ADA regulations provide:

> To determine the appropriate reasonable accommodation it may be necessary for the covered entity to initiate an informal, interactive process with the individual with a disability in need of the accommodation. This process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations.

29 C.F.R. § 1630.2(o)(3).

The duty to engage in an interactive process to identify a reasonable accommodation is generally triggered when an employee communicates to his employer his disability and his desire for an accommodation for that disability. *See EEOC v. C.R. England, Inc.*, 644 F.3d 1028, 1049 (10th Cir. 2011) ("[B]efore an employer's duty to provide reasonable accommodations — or even to participate in the "interactive process" — is triggered under the ADA, the employee must make an adequate request, thereby putting the employer on notice."); *Dargis v. Sheahan*, 526 F.3d 981, 988, (7th Cir. 2008) ("When . . . the disabled worker has communicated his disability to his employer and asked for an accommodation so that he can continue working, the employer has the burden of exploring with the worker the possibility of a reasonable accommodation.") (internal quotation marks omitted); *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 313 (3d Cir. 1999) ("What matters under the ADA [is] . . . whether the employee or a representative for the employee provides the employer with enough information that, under the circumstances, the

employer can be fairly said to know of both the disability and desire for an accommodation); *Taylor v. Principal Fin. Group, Inc.*, 93 F.3d 155, 165 (5th Cir. 1996) ("[I]t is the employee's initial request for an accommodation which triggers the employer's obligation to participate in the interactive process of determining one.").

But the interactive process "is not an end in itself; rather it is a means for determining what reasonable accommodations are available to allow a disabled individual to perform the essential job functions of the position sought." *Rehling v. City of Chi.*, 207 F.3d 1009, 1015 (7th Cir. 2000) (internal quotation marks omitted). Therefore, even if an employer's duty to engage in the interactive process is triggered, the employer's liability for failing to engage in that process may collapse for a number of reasons.

For example, an employer who fails to engage in the interactive process will not be held liable if the employee cannot identify a reasonable accommodation that would have been possible. *See Barber ex rel. Barber v. Colorado Dep't of Revenue*, 562 F.3d 1222, 1231 (10th Cir. 2009) ("Prior cases establish that a disabled plaintiff alleging that an employer failed to properly engage in the interactive process must also establish that the interactive process would have likely produced a reasonable accommodation."); *see also Dargis*, 526 F.3d at 988 ("The [employer] being able to make the required showing that no reasonable accommodation was possible, there was no further interactive process necessary.").

Likewise, "liability for failure to engage in an interactive process depends on a finding that, had a good faith interactive process occurred, the parties could have found a reasonable accommodation that would enable the disabled person to perform the job's essential functions." *Jones v. Nationwide Life Ins. Co.*, 696 F.3d 78, 91 (1st Cir. 2012) (internal quotation marks omitted). In this regard, Wilson cannot escape the

requirements of his prima facie failure-to-accommodate claim.

It is clear from the record that no reasonable accommodation could have enabled Wilson to perform the essential functions of his position the night of April 7. Nor could the accommodation Wilson did request — two days of leave — have enabled him to perform those functions on April 9. Wilson has failed to identify a possible reasonable accommodation that could have been discovered in the interactive process and would have allowed him to perform the essential functions of his position. *See Halpern*, 669 F.3d at 466 (rejecting medical student's interactive process argument on the grounds that no accommodation could have been identified that would have erased his record of misconduct and rendered him qualified for the medical school's program). Therefore, Dollar General cannot be held liable for a failure to engage in the interactive process.

## IV.

Accordingly, the district court's grant of summary judgment is

*AFFIRMED*.