**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

─────────────

**No. 24-1432**

─────────────

SALLY W. TARQUINIO,

Plaintiff − Appellant,

v.

JOHNS HOPKINS UNIVERSITY APPLIED PHYSICS LAB,

Defendant – Appellee.

─────────────

Appeal from the United States District Court for the District of Maryland, at Baltimore. Richard D. Bennett, Senior District Judge.  (1:23−cv−00727−RDB)

─────────────

Argued:  January 28, 2025                              Decided:  June 25, 2025

─────────────

Before DIAZ, Chief Judge, and QUATTLEBAUM and RUSHING, Circuit Judges.

─────────────

Affirmed by published opinion.  Chief Judge Diaz wrote the opinion, in which Judge Quattlebaum and Judge Rushing joined.

─────────────

**ARGUED:**  Francis J. Collins, KSC LAW, Baltimore, Maryland, for Appellant.  Jeremy Steven Schneider, JACKSON LEWIS P.C., Reston, Virginia, for Appellee.  **ON BRIEF:** Jason A. Ross, JACKSON LEWIS P.C., Reston, Virginia, for Appellee.

─────────────

DIAZ, Chief Judge:

In the second year of the COVID-19 pandemic, Johns Hopkins University's Applied Physics Lab directed its employees to vaccinate themselves against the disease. Sally Tarquinio, who suffers from "Lyme-induced immune dysregulation," asked for a medical exemption to accommodate her asserted disability.

The lab was puzzled. Medically speaking, it wasn't clear why Tarquinio's condition prevented her from getting vaccinated. The lab asked to speak with Tarquinio's doctors.

Tarquinio refused, so the lab denied Tarquinio's request as insufficiently supported. Still, Tarquinio was sure that her immune system would respond poorly to the vaccine, and she declined to take it. Because Tarquinio had neither a vaccine nor an exemption, the lab fired her.

Tarquinio sued under the Americans with Disabilities Act, and the district court entered summary judgment for the lab. Tarquinio appeals. Because Tarquinio kept the lab from understanding her condition, she has no claim, and we affirm.

I.

A.

In September 2021, then-President Biden took several executive actions to encourage COVID-19 vaccination. One of his orders required federal contractors to "comply with all guidance" issued by the Safer Federal Workforce Task Force. Exec. Order No. 14,042 § 2(a), 86 Fed. Reg. 50985, 50985 (Sept. 9, 2021), *revoked by* Exec. Order. No. 14,099 § 2, 88 Fed. Reg. 30891, 30891 (May 9, 2023). The task force's guidance,

2

issued soon after, required all contractors' employees to be vaccinated against COVID-19 (absent an accommodation). Safer Fed. Workforce Task Force, COVID-19 Workplace Safety: Guidance for Federal Contractors and Subcontractors 1 (Sept. 24, 2021) [https://perma.cc/8GT5-P4CH].

Johns Hopkins University's Applied Physics Lab is a federal contractor. To comply with the task force's guidance, the lab instructed every employee to either get a COVID-19 vaccine or an exemption from the vaccination policy. The lab gave employees who wanted medical or religious accommodations two and a half weeks to request them.

## B.

Sally Tarquinio, a systems engineer at the lab, has twice been diagnosed with Lyme disease.[1] She has struggled with complications that she and her doctors attribute to lingering after-effects of the disease. Tarquinio reports fatigue and weight loss alleviated only by restrictive diets and extensive detoxes. She and her doctors call her long-term illness "chronic Lyme disease" and the condition it produces "Lyme-induced immune dysregulation."[2] J.A. 100, 122.

When the lab announced its mandatory vaccination policy, Tarquinio asked for a medical accommodation—exemption from COVID-19 vaccination and testing. She stated that her condition was a form of "excessive immune activation . . . similar to [an]

---

[1] Since Tarquinio lost on summary judgment, we cast the record in her favor. *See Lashley v. Spartanburg Methodist Coll.*, 66 F.4th 168, 173 (4th Cir. 2023).

[2] The lab never questioned that Tarquinio's condition counts as a disability, so neither do we.

3

autoimmune disease." She feared that if she got vaccinated, the COVID antigens would cause her "body [to] go crazy due to immune chaos." J.A. 99.

In support of her request, Tarquinio submitted a 2012 blood test that showed she'd had Lyme disease when the test was taken. Tarquinio also submitted a form signed by her health care provider. The form named "chronic Lyme Disease [and] Lyme induced immune dysregulation" as the basis for Tarquinio's request. J.A. 100.

Ten days later, Tarquinio reached out for an update. The lab told her it "still" needed permission to access Tarquinio's medical records and speak to her doctors. J.A. 116.

Meanwhile, the lab reviewed Tarquinio's application as best it could. Because "Lyme disease is not a medical contraindication" for COVID vaccination, the lab's medical officer (Dr. Clarence Lam) decided that he needed "[f]urther explanation" of Tarquinio's condition and why it foreclosed vaccination. J.A. 224.

The same day, without knowing Lam's views, Tarquinio sent lab personnel (including Dr. Lam) a long email. She explained that she loved her job and thought that she was being forced to choose between her health and her work. She repeated her belief that if she were to take the COVID-19 vaccine, her "body [would] go crazy due to immune chaos, and most likely [suffer] a bad outcome." J.A. 225. Finally, she offered a compromise: she would take a "weekly CDC-approved saliva [COVID-19] test administered on-site at a quality facility that [she'd] pay [for] out of [her] own pocket," and "[w]ork on-site for 2 to 5 days a week, and at home the other days." J.A. 226.

Dr. Lam responded to his colleagues. Lam said he'd revisit Tarquinio's request if she gave the lab "current documentation signed by [her] provider." J.A. 225.

4

> To follow up, the lab contacted Tarquinio:
>
> Ms. Tarquin[i]o,
> The medical documentation you have submitted is over nine years old.  Can you please provide current medical documentation from [a] medical provider as to whether the previously stated concerns are still ongoing and why the COVID[-]19 vaccine is contraindicated with respect to your specific medical condition.

J.A. 118.

Tarquinio responded with another narrative.  She explained that Lyme disease "does not go away."  J.A. 122.  She repeated that she was "[t]errified" to introduce the COVID vaccine into her body.  She asserted that her doctor was "strongly advising [her] not to take a vaccine."  J.A. 124.  And she made the lab another offer: exemption from the vaccine requirement, weekly COVID-19 testing, and permission to work remotely three days a week.  Tarquinio's second email, like her first, provided no current medical documents, and enclosed no confirmation from her doctor.

Tarquinio's second email did link to two scientific papers, which Tarquinio said her health care provider had sent her "in support [of her] request."  J.A. 123.  The papers, published in 2004 and 2005, discussed the possibility that Lyme disease could trigger chronic autoimmune disease.[3]  But neither paper discussed vaccination, and Tarquinio didn't explain why they were relevant.

---

[3] S.K. Singh & H.J. Girschick, *Lyme Borreliosis: From Infection to Autoimmunity*, 10 Clinical Microbiology & Infection 598 (2004) https://doi.org/10.1111/j.1469-0691.2004.00895.x [https://perma.cc/ZNV4-C5X7] (J.A. 147–63); Elizabeth S. Raveche et al., *Evidence of* Borrelia *Autoimmunity-Induced Component of Lyme Carditis and Arthritis*, 43 J. Clinical Microbiology 850 (2005) https://doi.org/10.1128/jcm.43.2.850-856.2005 [https://perma.cc/RRY5-S4P2] (J.A. 127–45).

A few days later, the lab followed up. It once again asked Tarquinio to release her medical records to the lab and repeated that the lab still had no "medical justification for an accommodation." J.A. 177 ¶ 10. Tarquinio refused. In her view, because the lab already knew everything it needed to, it must have wanted to contact her doctors to second-guess their medical judgment.

Left without access to Tarquinio's records and doctors, Lam declined to grant a medical exemption:

> Per our discussion of this request from today's meeting and the last prior meeting, it does not appear that there is sufficient documentation to justify a medical accommodation at this time. There is no evidence that Lyme disease should affect an individual's ability to be vaccinated for [COVID-19] and it is not a CDC recognized clinical contraindication. The documentation cited by the employee is 9 years old and she is unable to cite or provide more recent documentation from the provider. She has also not signed a release to communicate with the provider. As I mentioned earlier, I am happy to speak with the outside provider if requested/desired. I will consider this case closed at this time, pending any further updates.

J.A. 228. The next day, the lab sent Tarquinio a letter denying her accommodations request as "insufficiently supported." J.A. 166.

Three days after the lab's letter, Tarquinio emailed the lab a blood test showing that her blood was low in CD57, a marker that she asserted showed her immune system was weak. But as the lab explained when it responded to Tarquinio, that blood test didn't matter. The lab's denial hadn't "turn[ed] on whether [Tarquinio had] established the underlying diagnosis . . . but, rather, whether [she had] established a condition that is contraindicated for receiving the COVID-19 vaccination according to CDC guidelines." J.A. 169.

In the end, Tarquinio never got vaccinated, and she never got an exemption. So the lab fired her.

## C.

Tarquinio sued. She alleged that the lab (1) didn't accommodate her disability (Count I), (2) fired her because of her disability (Count II), and (3) subjected her to an unlawful medical examination (Count III). Each of these acts, Tarquinio pleaded, was prohibited by section 102 of the Americans with Disabilities Act (ADA). *Tarquinio v. Johns Hopkins Univ. Applied Physics Lab*, No. 23-cv-727, 2024 WL 1604493, at *1 (D. Md. Apr. 11, 2024).

The lab moved for summary judgment. Tarquinio opposed the lab's motion "generally . . . as to Counts II and III, and specifically as to Count I." Pl.'s Mem. in Opp'n to Def.'s Mot. for Summ. J. at 1, *Tarquinio v. Johns Hopkins Univ. Applied Physics Lab*, No. 23-cv-727 (D. Md. Jan. 25, 2024), ECF No. 26. The district court granted summary judgment to the lab on all counts. *Tarquinio*, 2024 WL 1604493, at *4–5.

## II.

Because the district court resolved Tarquinio's case on summary judgment, we review its decision de novo. *Lashley v. Spartanburg Methodist Coll.*, 66 F.4th 168, 173 (4th Cir. 2023). We construe the evidence and draw all reasonable inferences in Tarquinio's favor. *Id.* After doing so, we ask whether the lab showed there was "no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). If the lab did so—for instance, by showing that Tarquinio "failed to make a sufficient showing on an essential element of her case with

respect to which she has the burden of proof," *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)—then summary judgment was proper.

## III.

We start and end with Tarquinio's failure-to-accommodate claim.[4]

Section 102 of the Americans with Disabilities Act makes it unlawful to "discriminate against a qualified individual on the basis of disability." 42 U.S.C. § 12112(a). Congress defined that term to include "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified [employee] with a disability," absent undue hardship to the employer. *Id.* § 12112(b)(5)(A).

The ADA's implementing regulations contemplate that an employer will often have to "initiate an informal, interactive process" with an employee to identify a reasonable accommodation. 29 C.F.R. § 1630.2(o)(3). This process, as envisioned by the regulations, "should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." *Id.*

---

[4] Tarquinio made no arguments in the district court against summary judgment on the other two counts of her complaint. Every ground she gives to save those claims is new to this appeal, so we consider none of them. *Campbell v. Bos. Sci. Corp.*, 882 F.3d 70, 80 (4th Cir. 2018). Tarquinio's "general" objection in the district court doesn't change the result: "a party must do more than raise a non-specific objection or claim to preserve a more specific argument on appeal." *Wards Corner Beauty Acad. v. Nat'l Accrediting Comm'n of Career Arts & Scis.*, 922 F.3d 568, 578 (4th Cir. 2019).

To make out a failure-to-accommodate claim, Tarquinio had to show that "(i) she was disabled, (ii) the employer had notice of her disability, (iii) she could perform the essential functions of her position with a reasonable accommodation, and (iv) the employer refused to make such accommodation." *Cowgill v. First Data Techs., Inc.*, 41 F.4th 370, 378 (4th Cir. 2022). We've read the fourth element to require the employer's good-faith participation in § 1630.2(o)(3)'s interactive process. *See Wilson v. Dollar Gen. Corp.*, 717 F.3d 337, 346–47 (4th Cir. 2013).

## A.

The district court entered judgment for the lab because it held that Tarquinio was responsible for what it termed a "breakdown" in the interactive process. *Tarquinio*, 2024 WL 1604493, at *4. From the district court's point of view, "an *employer* [could] not be held liable for failing to provide a reasonable accommodation where the *employee* refused to engage in or caused the breakdown." *Id.* When Tarquinio "declined to sign the medical release form that would allow Dr. Lam to make an informed decision," the court reasoned, she "refused to participate" in the interactive process despite the lab's "good faith" efforts, foreclosing liability. *Id.*

The district court set aside the elements of Tarquinio's failure-to-accommodate claim and abstractly assigned blame for the lapsed negotiations. "But the interactive process is not an end in itself," *Wilson*, 717 F.3d at 347 (cleaned up), and we doubt that an employer has a complete defense whenever it can pin blame for a breakdown in that process on an employee. We therefore take this opportunity to clarify what the interactive process is and does.

9

The ADA imposes failure-to-accommodate liability only on employers who don't make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability." 42 U.S.C. § 12112(b)(5)(A). That subparagraph imposes "an affirmative, ADA-created duty" to accommodate disabled persons' limitations, *Exby-Stolley v. Bd. of Cnty. Comm'rs*, 979 F.3d 784, 796 (10th Cir. 2020) (en banc), so they can "obtain the same workplace opportunities that those without disabilities automatically enjoy," *US Airways, Inc. v. Barnett*, 535 U.S. 391, 397 (2002) (emphasis removed).

The interactive process helps employers to discharge their duty to accommodate. Largely, that means giving employers and employees a chance to work together to figure out what accommodation, if any, would be reasonable and not unduly burdensome.

An employer's obligation to engage in the interactive process is therefore closely tied to its duty to accommodate. *See Jacobs v. N.C. Admin. Off. of the Cts.*, 780 F.3d 562, 581 (4th Cir. 2015). That's why we've said that an employer who doesn't engage in good faith with the interactive process violates the ADA so long as a reasonable accommodation was possible. *See Wilson*, 717 F.3d at 347. An employer who disrupts or sabotages the process by which accommodations are determined isn't providing its disabled employees with the equal opportunity the ADA mandates.

But the interactive process also gives the employer a chance to confirm that it has a duty to accommodate to begin with. Under the ADA, a disability is (among other things) an "impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102(1)(A). On this definition, disabilities cause limitations, which interfere with daily

10

life.[5]   And the ADA requires accommodating "known . . . limitations," not known disabilities.  *Id.* § 12112(b)(5)(A).  If an employee has a disability which causes limitations that interfere with work, and the employer knows it, then the employer must try to accommodate.  But if any link in that logical chain is missing, no duty arises, and there's no liability.  *See Youngman v. Peoria County*, 947 F.3d 1037, 1042 (7th Cir. 2020); *cf. Kelly v. Town of Abingdon*, 90 F.4th 158, 167–68 (4th Cir. 2024).

The interactive process helps employers to make that threshold call.  Employers "need not take the employee's word for it that the employee has [a disability] that may require special accommodation."  *EEOC v. Prevo's Fam. Mkt., Inc.*, 135 F.3d 1089, 1094 (6th Cir. 1998).  Rather, they have the right "to confirm whether a need for . . . accommodation exists."  *Id.* at 1094–95; *see Stewart v. St. Elizabeths Hosp.*, 589 F.3d 1305, 1308–09 (D.C. Cir. 2010) (Kavanaugh, J.).  That's why the ADA's implementing regulations specify that a goal of the interactive process is to "identify the precise limitations resulting from the disability."  29 C.F.R. § 1630.2(o)(3).

Our four-part failure-to-accommodate test doesn't account for these nuances.  That comes as no surprise: the case that introduced that test into our precedent, *Rhoads v. FDIC*, turned on the definition of disability, not on any aspect of the interactive process.  257 F.3d 373, 391 (4th Cir. 2001).  But as we've seen, the test's second part—notice of a disability— elides a necessary element.  To be liable for a failure to accommodate, employers must

---

[5] For instance, macular degeneration (a disability) causes loss of central vision (a limitation), which interferes with a major life activity ("seeing").  42 U.S.C. § 12102(2)(A).

know that an employee's disability limits her in a way that needs accommodating. Acquiring that knowledge is a central purpose of the interactive process.

Sometimes, the connection between disability, limitation, and need for accommodation is obvious. "A blind employee would not have to furnish medical records to establish that he needed some accommodation to be able to review written reports." *Langon v. Dep't of Health & Hum. Servs.*, 959 F.2d 1053, 1058 (D.C. Cir. 1992). When the need for accommodation is clear, and a reasonable accommodation is evident, the onus is on the employer to act.

We repeat that the interactive process is a means, not an end. Neither the employer nor the employee can rest on a breakdown in the interactive process without connecting that breakdown to an element of failure-to-accommodate liability. If the employer, for example, sabotages the interactive process to avoid discharging its duty, then the employee can use that sabotage to show that the employer refused an accommodation. But if the employee prevents the employer from understanding her disability, then the employer's duty never arises, and the employee's claim fails.[6]

---

[6] Our sister circuits agree on this basic point. *See, e.g.*, *Ali v. Regan*, 111 F.4th 1264, 1270 (D.C. Cir. 2024); *Kirilenko-Ison v. Bd. of Educ.*, 974 F.3d 652, 670 (6th Cir. 2020); *Jackson v. City of Chicago*, 414 F.3d 806, 813–14 (7th Cir. 2005); *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 317 (3d Cir. 1999); *Taylor v. Principal Fin. Grp.*, 93 F.3d 155, 165 (5th Cir. 1996).

B.

With the table set, it becomes clear what's missing from Tarquinio's case. Tarquinio told the lab about her disability, but she never showed that she was limited in a way that required accommodation.

Tarquinio disclosed her disability (Lyme-induced immune dysregulation) and her requested accommodation (an exemption from the lab's COVID vaccination requirement). She described many of her symptoms. But she never explained, beyond opaque references to "immune dysregulation," why her disability made COVID vaccination risky.

Maybe if the lab had been able to contact Tarquinio's medical providers, those providers could have explained that Tarquinio had an autoimmune disease so severe that, in their judgment, Tarquinio was more likely to be harmed by the COVID vaccine than by COVID. But Tarquinio refused to let that conversation happen.

No reasonable jury could conclude that the lab knew enough to be on proper notice of Tarquinio's needs. Faced with Tarquinio's unusual medical profile, the lab had the right to ask for more objective evidence. *See Prevo's Family Market*, 135 F.3d at 1094.

Because Tarquinio prevented the lab from learning why her condition required the accommodations that she asked for, she can't show that the lab had a duty to accommodate. As the district court recognized, the lab gave Tarquinio "ample opportunities" to explain, "and she continuously refused." *Tarquinio*, 2024 WL 1604493, at *4.

The district court's judgment is therefore

*AFFIRMED.*

13